## UNITED STATES v. BEST.
### Crim. No. 17666.

District Court, D. Massachusetts.
March 26, 1948.

See also 76 F.Supp. 138.

William T. McCarthy, U. S. Atty., and Gerald J. McCarthy, Asst. U. S. Atty., both of Boston, Mass., Theron L. Caudle, Asst. Atty. Gen., Clyde E. Gooch and Tom De-Wolfe, Sp. Assts. to the Atty. Gen., and Samuel C. Ely and Victor C. Woerheide, Special Attorneys, Department of Justice, both of Washington, D. C., for plaintiff.

Charles W. Bartlett and Henry M. Leen, both of Boston, Mass., and Maxmilian J. St. George, of Chicago, Ill., for defendant.

FORD, District Judge.

The defendant has moved for the suppression as evidence and return to him of certain property which he claims to own. The property consists of various written transcripts of broadcasts, recordings of broadcasts, personal letters, memoranda, clippings, books, articles of clothing, toilet articles, and travel equipment, claimed by Best to have been unlawfully seized from his premises at Waechtergasse No. 1, in the City of Vienna, Austria, and other places, by members of the United States Army and employees of the Department of Justice, in violation of his rights under the Fourth and Fifth Amendments of the United States Constitution.[1]

---

[1] "Amendment IV — Searches and Seizures.

"The right of the people to be secure in their persons, houses, papers, and ef-

It appears from the facts adduced and stipulated at the hearings on the motions that the defendant was arrested in January, 1946, by British forces in Vienna and turned over by them to the United States Army.

■ Orders to search the defendant's apartment at No. 1 Waechtergasse were given by the Commanding Officer of the 430th C. I. C. Detachment with headquarters in Vienna, Austria, in the same month, in accordance with military directives in force at the time and promulgated by the Joint Chiefs of Staff to the Commander-in-Chief of the United States Forces of Occupation Regarding the Military Government of Austria. When the orders to search were given, the United States Army authorities knew that Best had been engaged in propaganda activities for the German Reich and accordingly had reasonable grounds to believe that he had committed the crime of treason.

Two entries were made into Best's apartment. The first was gained through a Dr. Ludwig Priester, an Austrian police official, who had secured the keys to Best's apartment from the janitor of the building in which the defendant's apartment was located. The United States Army officer on this raid arranged, in the order of their importance, the documents, which consisted of books, speeches, newspaper clippings, files and letters and, except for documents not here concerned, left them in the apartment. A second entry was made about two weeks later by United States Army authorities at which time the documents and papers of Best were removed. Mrs. Robert H. Best accompanied the United States authorities on this second visit to Best's apartment and made no objection to the removal of the defendant's property. At the time of the entries and seizure of the property, the authorities were not in possession of a search warrant. All the papers and documents seized at this later entry have been returned to the defendant Best except the following:

Drafts of ten propaganda broadcasts written by defendant.

Draft of one propaganda leaflet written by defendant.

Defendant's copies of nine items of correspondence between him and German radio and other officials.

■ I. Ordinarily, search and seizure without the authority of a search warrant is prohibited as an unreasonable search and seizure within the meaning of the Fourth Amendment and a conviction based on evidence thus obtained cannot stand. Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098; Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652; Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647.

■ However, there are exceptions to the safeguard of a warrant issued by a magistrate, i. e., where circumstances preclude the obtaining of a warrant. Carroll v. United States, 267 U.S. 132, 156, 45 S.Ct. 280, 69 L.Ed. 543, 39 A.L.R. 790. At the hearing on these motions, conditions that prevailed in Austria at the time of the search and seizure were described in very great detail. These conditions are set forth later in this memorandum. Certainly our federal courts had no power to issue a search warrant to be acted upon in Austria. Weinberg v. United States, 2 Cir., 126 F.2d 1004. The Austrian courts had no jurisdiction over American nationals. Government's Exhibit 6, Austrian Military Government Handbook, Annex 32B, p. 3, Art. 7, Para. 14. See Dow v. Johnson, 100 U.S. 158, 165, 25 L.Ed. 632. The occupying forces had no machinery for the issuance of search warrants. It follows that not only was it impracticable to obtain a search warrant under the conditions that existed in Austria at the time; it was impossible to do so. Thus it is perfectly apparent that search and seizure of Best's property at the time it was made cannot be said to be unreasonable within the meaning of the

fects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or Affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

"Amendment V—Capital Crimes: Due Process.

"No person * * * shall be compelled in any criminal case to be a witness against himself * * *."

Fourth Amendment merely because of the lack of a search warrant.

■ The evidence showed that the Army authorities, when the property concerned in these motions was finally taken by them, entered the defendant's premises with the consent of Mrs. Best and that at the time of entry they had reasonable grounds to believe that Best had joined up with the enemy and had committed the crime of treason and they knew the manner in which he was alleged to have committed treason, namely, by engaging in broadcasting activities for the German Reich. Also, at the time, it was reasonable for the Army authorities to suspect, as they later found out, that Best was in possession and control of the transcripts of his broadcasts. Under the conditions that existed, the Army officers had the right to seize any property they would have been justified in seizing had they been able to procure a search warrant. This would include any property "which * * * has been used as the means of committing a criminal offense". Federal Rules of Criminal Procedure, Rule 41(b) (2), 18 U.S.C.A. following section 687; cf. Carroll v. United States, supra; Matthews v. Correa, 2 Cir., 135 F.2d 534, 537; and United States v. Poller, 2 Cir., 43 F.2d 911, 913, 74 A.L.R. 1382, cases where, without a warrant, the fruits of crime and means to commit crime were seized incident to an arrest.

This brings us to the question whether the property seized by United States Army forces was used by Best as instrumentalities or means of committing the crime of treason.

Evidence introduced by the government showed that all property, papers and documents taken by the Army authorities at the time of seizure were returned to defendant Best except copies of Best's propaganda speeches and leaflets and correspondence between Best and officials of Germany and the Radio Station concerning his activities and employment with the Reich Broadcasting Corp.

The indictment charges, in part, as treasonable acts that the defendant caused to be recorded talks for subsequent broadcast to the United States and also that he engaged in and performed the duties of a news editor in the offices of the United States of American Zone of the German Short Wave Radio Station.

■ It would appear that the propaganda speeches of the defendant were used as a means in the commission of the offense charged. They were employed to carry out the crime. United States v. Poller, supra, at page 914 of 43 F.2d. It is charged in the indictment that the recording of talks and speeches gave aid and comfort to the German Reich and assisted the enemy in the conduct of its war against the United States. And the evidence at the hearing on the motions showed that the defendant admitted to an agent of the United States Department of Justice that the transcripts seized were the very transcripts recorded and used for the subsequent broadcasts to the United States.

The letters and correspondence seized were used by Best to obtain employment with the German Short Wave Radio Station. These were means through which an alleged treason, namely performance of the duties of a news editor in the German Short Wave Radio Station, one of Germany's most potent weapons of warfare against the United States, was accomplished. These papers were used in perpetrating an alleged criminal offense; they were used in connection with the alleged crime of treason.

■ The objection to the use of these documents as evidence because they are the private papers of the defendant has no merit in the circumstances of this case. To be sure, the seizure of private papers from a person for the purpose of obtaining information or of using them in evidence against him at his trial runs afoul of the Fourth Amendment. United States v. Lefkowitz, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877, 82 A.L.R. 775. But we are not here, as in the Lefkowitz case, dealing with papers "in themselves unoffending." Id. at page 465 of 285 U.S., at page 423 of 52 S.Ct. Papers in which the public has an interest, as in papers used as a means of committing a criminal offense, have not the immunity of private papers. As was stated in the Gouled case, at page 309 of 255 U.S., at page 265 of 41 S.Ct.: "There is no special sanctity in papers, as dis-

tinguished from other forms of property, to render them immune from search and seizure, if only they fall within the scope of the principles of the cases in which other property may be seized, * * *."

▮ The search did not contravene the Fourth Amendment on the ground that it was in the nature of a general exploratory search for evidence. Harris v. United States, supra, at page 153 of 331 U.S., 67 S.Ct. 1098. The United States Army authorities had reasonable cause to believe that Best had aided Germany in the conduct of its war against the United States; they knew the manner in which he aided Germany, namely, by broadcasting or recording broadcasts; and when they searched Best's apartment, it is reasonable to infer, they were searching for property connected with his treason which included the transcripts of speeches that had been used in the broadcasts beamed from Germany to America and means used to secure employment with the German Reich. This was not a general search. It was a search to find and seize the instruments of the crime. Cf. Harris v. United States, supra, at page 153 of 331 U.S., 67 S.Ct. 1098. The fact that the officers seized some papers that were not used in perpetrating the offense of treason does not make the search a general exploratory search where the limited object of the search is so well defined beforehand. It does not contravene the Fourth Amendment if papers are seized in addition to those in which the public has an interest, at least where papers that could be regarded as private papers have been returned by the government to the owner, as has been done here. Matthews v. Correa, supra; United States v. Poller, supra. See dissenting opinion of Judge Swan in Lefkowitz v. United States Attorney, 2 Cir., 52 F.2d 52, 55.

▮ Nor can it be said that the manner of the search, under the circumstances, exceeded reasonable bounds. Cf. United States v. Lefkowitz, supra, page 460 of 285 U.S., 52 S.Ct. 420; Go-Bart Co. v. United States, 282 U.S. 344, 358, 51 S.Ct. 153, 75 L.Ed. 374. The articles seized were in plain sight in the apartment when the United States Army representatives entered Best's apartment and the property

was catalogued. Practically all of it had some relation to Best's broadcasting activities. The items were screened and sorted on this date and on a later date removed from a room belonging to another family (cf. United States v. Gass, D.C., 17 F.2d 996) to which the searching officers were directed by Mrs. Best and which led off the hall adjacent to Best's apartment. It is fairly inferable that they were placed there by direction of Mrs. Best, as she was interested in separating and claiming her own possessions in the apartment. If the Lefkowitz and the Go-Bart cases stand for the rule that the manner of the search must be reasonable, this court concludes that the search made in the instant case, at least in time of war in an occupied country under military government, does not violate that principle. The authorities confined their search almost exclusively to property that had a relation to the crime of which Best was suspect. There was no opening of safes, desks, and cabinets as there was in the two cited cases and which gave the search the complexion of a general exploratory search. It would be difficult to reach a conclusion that the "intensity of the search exceeded reasonable bounds" (Matthews v. Correa, supra, at page 537 of 135 F.2d) where nothing more was done than what the Army did at Best's apartment.

▮ II. There are further reasons based on military necessity why the search and seizure were not prohibited by the Fourth Amendment. The Fourth Amendment prohibits only unreasonable searches and seizures. "There is no formula for the determination of reasonableness. Each case is to be decided on its own facts and circumstances." Go-Bart Co. v. United States, supra, at page 357, of 282 U.S., at page 158 of 51 S.Ct.; Harris v. United States, supra, at page 150 of 331 U.S., 67 S. Ct. 1098.

▮ The circumstances in Austria when the search of defendant's premises and seizure of his papers occurred distinguish this case from any precedent. The Austria of March, 1946, was still in the wake of World War II. "At that time there was a mass transfer of populations running into hundreds of thousands. People were going

from western Europe to eastern Europe, and back the other way; and from south to north, and vice-versa; and Austria, particularly Vienna, was sort of a crossroads for these people, and it was a function of Military Government to establish Displaced Persons camps, to supervise the heating, housing, clothing, and so forth, of this mass of people. The railroad systems were functioning on a very limited basis and then only under control of Military Government. The public utilities were functioning only, I would say, about 35 per cent at that time. The population was on a starvation diet, and most of their food was coming from Military Government sources, not only the United States but from the French, British and Russian Military Government sources. Hospitals were overcrowded, there was considerable bomb damage, particularly in Vienna." Testimony of Lt. Col. Buldain.

 It is true that the shooting war was over in March, 1946, but the technical state of war continued to exist. More important, the situation described above was such as could only be handled by the exercise of military powers. There were large groups of people of many nationalities to be classified and relocated, all the while they were being fed, clothed and sheltered by the occupying army. Although Austria was designated occupied liberated rather than occupied enemy territory, there was a substantial hostile element of the population to control. The solution of these problems, as well as the reconstitution of the Austrian state as a functioning entity, required the continued exercise of the war powers of the national government. The war power includes more than the power to wage campaigns in the field. It must include the power to consolidate the gains so made by a military occupation or a military government. Ex parte Milligan, 4 Wall. 2, 71 U.S. 2, 141, 18 L.Ed. 281.

 Under the circumstances pertaining in Austria during March, 1946, described above, the overwhelming necessity of summary type action is apparent. Such action must be uniform for all residents of the occupied area, it being beyond the facilities of the military to distinguish the United States citizen from nationals of other countries on short notice and to apply to them a jurisprudence different from that applied to other persons. This is not to say that anything the Commander may do to United States citizens, any rights whatever he may abrogate, will go unchecked by the courts of this country. However, if he acts reasonably under the circumstances and conformably to military government practice without abuse of his wide discretion, his decisions must stand. "Where * * * the conditions call for the exercise of judgment and discretion and for the choice of means by those branches of the Government on which the Constitution has placed the responsibility of war-making, it is not for any court to sit in review of the wisdom of their action or substitute its judgment for theirs." Hirabayashi v. United States, 320 U.S. 81, 93, 63 S.Ct. 1375, 1382, 87 L.Ed. 1774.

The Commander-in-Chief of United States forces in Austria was directed as follows:

"5.d. Property, real and personal, owned or controlled by the Nazi Party, its formations, affiliated associations and supervised organizations, and by all persons subject to arrest under the provisions of paragraph 7 below, and found within your zone will be taken under your control pending a decision by the Allied Council or higher authority as to its eventual disposition." Government's Exhibit No. 4, Joint Chiefs of Staff Directive to Commander-in-Chief of United States Forces of Occupation Regarding the Military Government of Austria, p. 72.

"7.b. All persons who if permitted to remain at large would endanger the accomplishment of your objectives will also be arrested and held in custody until their disposition is otherwise determined by an appropriate semi-judicial body to be established by you. The following is a partial list of the categories of persons to be arrested in order to carry out this policy: [Id. p. 74]

* * * * * *

"(10) Any national of any of the United Nations or associated states who is believed to have committed offenses against

his national law in support of the German war effort; * * *." Id. p. 75.

■ Orders for the search of defendant's apartment and seizure of his property proceeded from the staff of the Commanding General of United States Forces in Austria, to the Commander of the 430th Counter Intelligence Unit, and down the line to his subordinates who executed the search. The military knew that Best was suspected of treason and had been engaged in broadcasting activities for the German Reich. (Affidavits of military persons concerned.) It is not for this court to say that defendant's papers did not constitute a threat to the safety of the military occupation, or that the means employed by the commander were not calculated to remove the threat. Here in the United States we can afford to pay, for the freedom from arbitrary police methods, the slight cost of an occasional unpunished offender. In Austria, the Military Commander would not find the bargain so desirable. The cost might be, not an unpunished criminal here and there, but an enemy of the occupation forces spreading his influence into receptive channels, feeding the discontent of the population, organizing resistance movements, and hampering the reconstruction of a friendly state and the restoration of freedoms so recently destroyed by the Nazi regime. In this setting, in an occupied country under Military Government, a search and seizure deemed necessary by the highest military commanders, ordered by them to be conducted in the manner customarily employed by the military, with their orders relayed down the chain of military command, and executed in an orderly manner by military personnel, cannot be termed unreasonable. Thus defendant's rights under the Fourth Amendment were not violated.

■ III. Even if this search and seizure were inconsistent with the rights guaranteed by the Fourth Amendment, it is by no means certain that the defendant's motion should prevail. The protection of the Fourth Amendment does not extend to United States citizens in foreign countries, at least where it is not practicable to apply it. In Re Ross, 140 U.S. 453, 11 S.Ct. 897, 35 L.Ed. 581, the petitioner was imprisoned in New York, having been convicted, in the American consular tribunal in Japan, of the crime of murder committed on board an American ship in the harbor of Yokohama. He complained that he was neither indicted by a grand jury nor tried by a petit jury, and that his rights under the Fifth and Sixth Amendments were thereby violated. The United States Supreme Court, upholding the order of the Circuit Court denying the petitioner's motion for discharge from custody, said at page 464 of 140 U.S., at page 900 of 11 S.Ct.: "* * * By the constitution a government is ordained and established 'for the United States of America,' and not for countries outside of their limits. The guarantees it affords against accusation of capital or infamous crimes, except by indictment of presentment by a grand jury, and for an impartial trial by a jury when thus accused, apply only to citizens and others within the United States, or who are brought there for trial for alleged offences committed elsewhere, and not to residents or temporary sojourners abroad. Cook v. United States, 138 U.S. 157, 181, 11 S.Ct. 268 [34 L.Ed. 906]. The constitution can have no operation in another country. When, therefore, the representatives or officers of our government are permitted to exercise authority of any kind in another country, it must be on such conditions as the two countries may agree; the laws of neither one being obligatory upon the other. The deck of a private American vessel, it is true, is considered, for many purposes, constructively as territory of the United States; yet persons on board of such vessels, whether officers, sailors, or passengers, cannot invoke the protection of the provisions referred to until brought within the actual territorial boundaries of the United States. And, besides, their enforcement abroad in numerous places, where it would be highly important to have consuls invested with judicial authority, would be impracticable from the impossibility of obtaining a competent grand or petit jury. The requirement of such a body to accuse and to try an offender would, in a majority of cases, cause an abandonment of all prosecution. The framers of the

constitution, who were fully aware of the necessity of having judicial authority exercised by our consuls in non-Christian countries, if commercial intercourse was to be had with their people, never could have supposed that all the guarantees in the administration of the law upon criminals at home were to be transferred to such consular establishments, and applied before an American who had committed a felony there could be accused and tried. They must have known that such a requirement would defeat the main purpose of investing the consul with judicial authority. While, therefore, in one aspect the American accused of crime committed in those countries is deprived of the guarantees of the constitution against unjust accusation and a partial trial, yet in another aspect he is the gainer, in being withdrawn from the procedure of their tribunals, often arbitrary and oppressive, and sometimes accompanied with extreme cruelty and torture."

Casement v. Squier, 9 Cir., 138 F.2d 909, affirming D.C., 46 F.Supp. 296. See also Hawaii v. Mankichi, 190 U.S. 197, 23 S.Ct. 787, 47 L.Ed. 1016; Dorr v. United States, 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128; 1 Ann.Cas. 697; Balzac v. Porto Rico, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627, holding that various amendments to the Constitution do not apply to territory belonging to the United States which has not been incorporated into the Union.

 Just as it was impracticable to obtain a competent jury in the Ross case, so it is a fortiori impracticable to hedge the powers of the military commander in Austria with restraints upon search and seizure procedure designed for the United States in peacetime. This has been recognized in the cases.

 The leading case on the subject of power of military government is New Orleans v. The Steamship Co., 20 Wall. 387, 87 U.S. 387, 22 L.Ed. 354. It has been widely cited by courts and texts for the general proposition that the only limits to the military authority in occupied territory are those which are imposed by international law and usage. Willoughby on the Constitution, 2d Ed., p. 1577; Winthrop's Military Law and Precedents, 2d Ed., p. 801; Whiting, War Powers under the Constitution of the United States, 43d Ed., p. 270; Fairman, The Law of Martial Rule, 2d Ed., p. 40. At page 394 of 20 Wall., in the New Orleans case, the court said: "* * * the conquering power has a right to displace the pre-existing authority, and to assume to such extent as it may deem proper the exercise by itself of all the powers and functions of government. * * * It may do anything necessary to strengthen itself and weaken the enemy. There is no limit to the powers that may be exerted in such cases, save those which are found in the laws and usages of war * * *. In such cases the laws of war take the place of the Constitution and laws of the United States as applied in time of peace." See also Cross et al. v. Harrison, 16 How. 164, 57 U.S. 164, 14 L.Ed. 889; Dooley v. United States, 182 U.S. 222, 21 S.Ct. 762, 45 L.Ed. 1074; The Grapeshot, 9 Wall. 129, 76 U.S. 129, 19 L.Ed. 651; Leitensdorfer v. Webb, 20 How. 176, 61 U.S. 176, 15 L.Ed. 891. It is true that this dictum and these cases stating so broadly the powers of military government, concern property rights, and that civil or personal rights are more preciously guarded. But even in the United States the Constitutional rights and liberties of citizens give way to the necessities of war. Luther v. Borden, 7 How. 1, 48 U.S. 1, 45, 12 L.Ed. 581; Hirabayashi v. United States, supra. This is not to say that the rights go completely unguarded, but only that extreme necessity temporarily curtails them. It is not necessary to go further than this to justify the conclusion that the defendant's motions to suppress should be denied.

IV. The defendant alleges in his motions that property was seized at "other places" than in Austria by other than members of the United States Army.

There is no evidence that property of the defendant was seized at places other than his residence in Vienna, Austria, or by other than members of the armed forces. There is no need to discuss this aspect of the motions.

The motions to return the property now involved in these motions and suppress its use as evidence are denied.