UNITED STATES, Appellee

v

PROFESSOR BROWN, Specialist Fourth Class, U. S. Army, Appellant

10 USCMA 482, 28 CMR 48

484

No. 12,675

Decided June 26, 1959

*Major Edward Fenig* argued the cause for Appellant, Accused. With him on the brief was *First Lieutenant Philip J. Miller.*

*First Lieutenant George H. Parsons* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel James G. McConaughy, Major Thomas J. Nichols,* and *First Lieutenant Frank J. McGee.*

## Opinion of the Court

HOMER FERGUSON, Judge:

The accused was convicted by a general court-martial of wrongful possession of heroin, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. This Court granted review of two issues:

1. Whether the law officer erred in not permitting defense counsel to state the grounds of his objection to Exhibit 1, and in overruling the defense objection to the search without inquiring into the legality thereof.

2. Whether the search and seizure was legal.

The pertinent facts will be noted where necessary to a discussion of the issues. Concerning the first issue, the following appears in the record:

"Q Who was searching the accused?

"A Sergeant First Class Templeton.

. . . . .

"Q Did Sergeant Templeton give you anything at that time?

"IC: I object.

"LO: Overruled.

"IC: May I state the grounds?

"LO: Overruled. Continue.

"Q Did Sergeant Templeton give you anything when you were standing next to the accused?

"A He did. He gave me two small bottles. One was empty. The other was full, after I looked at it.

"IC: I move that the answer be stricken, on the grounds that this was an illegal search.

"LO: Overruled."

It is the law officer's task to rule initially on the admissibility of evidence. United States v Stewart, 1 USCMA 648, 5 CMR 76. While his ruling is not lightly to be disregarded, if it is incorrect as a matter of law, an appellate tribunal is not bound by it. United States v DeLeon, 5 USCMA 747, 19 CMR 43.

To aid the judge or law officer in his task, there is imposed upon counsel the duty of objecting to evidence considered to be inadmissible. "The function of the objection is, first, to signify that there is an issue of law, and, secondly, to give notice of the terms of the issue." Wigmore, Evidence, 3d ed, § 18. The specific grounds for the objection must be stated, and ordinarily new bases may not be raised for the first time on appeal. Boston and A. R. Co. v O'Reilly, 158 US 334, 15 S Ct 830, 39 L ed 1006. See generally Wigmore, supra, § 18. The basis for the rule has been stated thusly:

". . . The object of requiring the grounds of objection to be stated, which may seem to be a technicality, is really to avoid technicalities, and prevent delay in the administration of justice. When evidence is offered to which there is some objection, substantial justice requires that the objection be specified, so that the party offering the evidence can remove it, if possible, and let the case be tried on its merits. If it is objected that the question is leading, the form may be changed; if that the evidence is irrelevant, the relevancy may be shown; if that it is incompetent, the incompetency may be removed; if that it is immaterial, its materiality may be established; if to the order of introduction, it may be withdrawn and offered at another time,—and thus appeals could often be saved, delays avoided, and substantial justice administered." [Rush v French, 1 Ariz 99, 25 Pac 816, 822.]

These well-established concepts are designed to aid in the orderly administration of justice. In the instant case, however, we do not have a situation where defense counsel failed to object, nor was the failure to specify the grounds for his protest attributable to him. It was the law officer who not

only arbitrarily overruled the objection but, upon request, refused to permit the defense counsel to state his grounds. Such arbitrary action usually results in an uninformed ruling and generally deprives appellate authorities of a proper record upon which to assess the correctness of the law officer's action. Either result may prove fatal to the validity of any ensuing conviction.

When the evidence was thus admitted, defense counsel moved that it be stricken because it was the ■ product of an illegal search. This, in effect, was a renewal of the earlier objection, and the question of the search's legality was thereby put in issue. Upon objection, the Government had the burden of establishing its propriety. United States v Berry, 6 USCMA 609, 20 CMR 325. As the Chief Judge, speaking for a unanimous Court, said in United States v Weaver, 9 USCMA 13, 25 CMR 275:

"Certainly the mere assertion that a search is illegal is an insufficient basis upon which to make an informed ruling. Inquiry into the basis, and the circumstances, of the search must be made."

The law officer thus compounded his previous error by again overruling the objection without any inquiry into the circumstances. Such action cannot be condoned.

While the law officer's ruling was uninformed, the evidence subsequently received sufficiently reflects the circumstances of the search to permit an informed appellate judgment thereon. Thus, while we deem his arbitrariness prejudicial, we also pass to the second granted issue which squarely presents the question of the legality of the search.

The circumstances under which the search took place were briefly as follows: On June 14, 1958, the accused and nine other soldiers, all of whom were on pass, were transported to Community Center 1 on an Army truck. Six or seven of the ten had been suspected for the past four months of using narcotics. The accused's commanding officer, Lieutenant Clark, received information that one of the ten had borrowed $10.00 before going on pass. Included in the group was one individual, not the accused, who reputedly had been "caught" with narcotics but never tried because of a defect in the chain of custody. Acting upon his suspicions, Lieutenant Clark arranged for a search of all ten of the men upon their return. When they returned on the truck, all ten were "apprehended," searched, stripped, and searched again. Sergeant First Class Templeton testified that he found two bottles of heroin (Prosecution Exhibit 1) on the accused.

Both parties in essence have treated the question as one of the reasonableness of the search. Only ■ unreasonable searches are prohibited. Carroll v United States, 267 US 132, 45 S Ct 280, 69 L ed 543. The question is simply one of whether there was probable cause to search. What is reasonable, of course, may vary according to the circumstances. For example, a search which may be considered reasonable on a wartime battle front to secure evidence of spying might, under different conditions, be regarded as highly irregular.

The opinions of Federal courts support five general types of searches as legal. Paragraph 152, Manual for Courts-Martial, United States, 1951, lists them as follows:

1. "A search conducted in accordance with the authority granted by a lawful search warrant."

2. "A search of an individual's person, of the clothing he is wearing, and of the property in his immediate possession or control, conducted as an incident of lawfully apprehending him."

3. "A search under circumstances demanding immediate action to prevent the removal or disposal of property believed on reasonable grounds to be criminal goods."

4. "A search made with the freely given consent of the owner in possession of the property searched."

5. "A search of property which is

owned or controlled by the United States and is under the control of an armed force, or of property which is located within a military installation or in a foreign country or in occupied territory and is owned, used, or occupied by persons subject to military law or to the law of war, which search has been authorized by a commanding officer (including an officer in charge) having jurisdiction over the place where the property is situated or, if the property is in a foreign country or in occupied territory, over personnel subject to military law or to the law of war in the place where the property is situated. . . ."

The first and fifth categories are clearly inapplicable here, there having been no search warrant and the search having been of the person rather than of property. The fourth type of search listed also gives us little █ pause. Here, there was no grant of consent. A peaceful submission to officers of the law, that is to say, an acquiescence in the search, is not consent. United States v Heck, 6 CMR 223.

Concerning the third type of search, there being no information that criminal goods could be found, █ there can be no valid contention that immediate action was needed to prevent their removal or disposal. There is nothing in the record to support any contention that Lieutenant Clark was aware of any facts which rendered immediate action necessary.[1]

Finally, concerning the second type of search listed by the █ Manual as being lawful, we █ find it inapplicable here as there was no lawful apprehension. Although Lieutenant Clark,

as an officer, had authority to apprehend (see Manual for Courts-Martial, supra, paragraph 19), the person making an apprehension must have a reasonable belief that an offense has been committed and that the person apprehended committed it. Article 7(b), Uniform Code of Military Justice, 10 USC § 807. The record shows no basis for any such belief by Lieutenant Clark. He merely suspected several men. This suspicion had continued for a period of four months with some surveillance during that period, yielding no results. The only circumstance which apparently differentiates the evening chosen for the search from any other evening was the information that one of the ten men had borrowed $10.00. As appellate defense counsel contends, if possession of money was to be the deciding factor, the search might better have been held immediately after payday. An apprehension may not be used as a pretext to search for evidence of crime. United States v Lefkowitz, 285 US 452, 52 S Ct 420, 76 L ed 877. Nor can an apprehension be validated by what it uncovers. United States v Asendio, 171 F2d 122 (CA3d Cir) (1948).

While there is substantial discretion vested in the commanding officer to order a search of persons and property under his command, consideration of all the circumstances herein make it clear beyond cavil that Lieutenant Clark acted on nothing more than mere suspicion.[2] Reasonable or probable cause was clearly lacking for both the apprehension and the search and, although the military permits certain deviations from civilian practice in the procedures for initiating a search, the substantive rights of the individual and the necessity that probable cause exist therefor remain the same.[3] Unreason-

---

[1] Cf. United States v Swanson, 3 USCMA 671, 14 CMR 89, where the search was held reasonable. There, the authorities were at least aware that money had in fact been stolen. In the instant case, there was no information whatever that one of those searched would possess narcotics.

[2] United States v Doyle, 1 USCMA 545, 4 CMR 137.

[3] In United States v Asendio, 171 F 2d 122 (CA 3d Cir) (1948), it was held there was no probable cause for a search by narcotics agents who had seen the transfer of a small package which turned out to be a narcotic. And in United States v Reynolds, 111 F Supp 589 (DC DC) (1953), the court granted a motion to suppress seized narcotics. There, an affidavit for a

able searches and seizures will not be tolerated. The great importance attached to the fundamental protection of the Constitution against unreasonable searches and seizures requires no elaboration. While we recognize the commanding officer's traditional authority to conduct a search in order to safeguard the security of his command, that issue is not presented here.

The action of Lieutenant Clark here was with utter disregard for the rights of the accused and the others. He acted upon mere suspicion with no factual basis for his action. He ordered a wholesale search of all those in the truck, those "suspected" and those regarded as completely innocent. He ordered that any suspicious objects be seized and turned over to him. The search was general and exploratory in nature and wholly lacking in reasonable cause. Without the evidence obtained as a result of the illegal search, i.e., the bottles of heroin, the prosecution's case must fall.

The decision of the board of review is reversed and the Charge ordered dismissed.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting):

I dissent.

Because I feel my associates inflate a trial incident out of proportion to its importance and decide the case without a full exposition of the principles governing search and seizure in the military services, I set forth my views in this separate opinion.

I

Turning first to the question of search and seizure, I find the principal opinion mentions the five illustrations of reasonable searches and seizures enumerated in the Manual and then proceeds to illustrate why they are inapplicable. The fault of that approach is that it glosses over the remaining portion of paragraph 152 which, after setting out the examples of lawful searches listed in the majority opinion, concludes with the statement:

". . . This example of authorized searches is not intended to preclude the legality of searches made by military personnel in the areas outlined above *when made in accordance with military custom*." [Emphasis supplied.]

If then, the examples from the Manual listed by my associates are not, as they imply, all-inclusive, I wonder why consideration is not given to the question of whether this search and seizure was reasonable under the general clause hereinabove quoted. It would appear to follow that when the Court uses the Manual as the source of law, it should consider all of the relevant provisions.

We have previously touched on the principle which my brothers do not apply here, and we have indicated our belief that a commanding officer has wide discretion in determining the necesity of ordering a search of persons or property under his authority. In United States v Doyle, 1 USCMA 545, 4 CMR 137, the Chief Judge, speaking for the Court, stated:

"There has long existed in the services a rule to the effect that a military commanding officer has the power to search military property within his jurisdiction. United States v Kemerer, 28 BR 393; Dig Op JAG 1912–1940, Section 395(27); CMO 11, 1929, page 5; CMO 11, 1929, page 11; United States v Worley, 3 CMR (AF) 424. The basis for this rule of discretion lies in the reason that, since such an officer has been vested with unusual responsibilities in regard to personnel, property, and material, it is necessary that he be given commensurate power to fulfill that responsibility. This rule and the reasons for it have been expressly recognized and approved by the Federal courts. United States v Best, 76 F Supp 857;

search warrant had been made by an agent who had received information from a reliable informant that the defendant, a known narcotics peddler, had a large quantity of narcotics buried in his basement. In addition, the agent knew the defendant had been convicted for a violation of the Marihuana Tax Act. The court held this to be mere suspicion.

Richardson v Zuppann, 81 F Supp 809. It is unnecessary, in this connection, to spell out the obvious policy considerations which require a differentiation between the power of a commanding officer over military property and the power of a police officer to invade a citizen's privacy. That there may be limitations upon the former's power, we do not doubt. Insofar as the power bears on criminal prosecutions, both trial courts and appellate forums are available to insure that the commanding officer does not abuse his discretion to the extent that the rights of an individual are unduly impaired."

The principle was reaffirmed in United States v Rhodes, 3 USCMA 73, 11 CMR 73. In that case, Judge Brosman, writing for a unanimous Court, stated:

". . . In the Doyle and Florence cases, supra [United States v Doyle, 1 USCMA 545, 4 CMR 137; United States v Florence, 1 USCMA 620, 5 CMR 48], we recognized the well-settled military rule that a commanding officer possesses authority to make or to order an inspection or search of personnel and property under his control. That rule is expressly embodied in the Manual for Courts-Martial, United States, 1951, paragraph 152, which also provides that one who is an 'officer in charge' is a 'commanding officer' within the meaning of the paragraph."

Again in the *Florence* case, a similar rule was expressed. There the accused, a clerk in the Army Graves Registration Section, was suspected of stealing deceased soldiers' personal effects which had been placed in his custody. The accused's commanding officer directly requested that he produce his wallet which was found to contain stolen property. In upholding the legality of the search, we said:

". . . The authority of a commanding officer to make or order an inspection or search of personnel and property under his control has long been recognized in military law. In CM 248379, United States v Wilson, 31 BR 231, a board of review considered the lawfulness of a search of the persons. The facts were these: Reliable information had been received by the commanding officer that articles were being taken from Army mail packages. The accused was placed under surveillance, and when an object was noticed bulging out of his pocket he was taken into the presence of his commanding officer and was asked what he had in his pocket. He thereupon pulled out a watch box which contained stolen property. The board of review in its holding stated:

' "Authority to make, or order, an inspection or search of a member of the military establishment, or of a public building *in a place under military control,* even though occupied as an office or as living quarters by a member of the military establishment, always has been regarded as indispensable to the maintenance of good order and discipline in any military command . . . such a search is not unreasonable and therefore not unlawful." JAG 250.413, July 23, 1930, and sec. 395 (27) Dig Ops JAG 1912–40). [Italics supplied.]'

"See also CM 335526 Tooze, 3 BR–JC 313.

"The rule of the Wilson and Tooze cases is cited with approval in ACM 4023, Arteaga (1951), 1 CMR 632. In that case a search of accused's person and footlocker, directed by his commanding officer because of reliable information received, resulted in the discovery of three marihuana cigarettes and an envelope containing marihuana. It was there pointed out that searches and seizures have been made pursuant to military command, as distinguished from civil warrant, ever since the foundation of this Government, and that military law does not prohibit searches without warrant, citing United States v Clark, 31 Fed 710, and In re Grimley, 137 US 147, 34 L ed 636, 11 S Ct 54. That decision points out that as there is in the Manual for Court's

490

Martial no requirement for the affidavit of probable cause required by civil statute, an appropriate commanding officer's exercise of discretion in authorizing a particular search is the acceptable substitute and cannot ordinarily be questioned, citing ACM 1458, United States v Worley, 3 CMR (AF) 424; ACM 3682, United States v Hopkins, 4 CMR (AF) 553)."

For support of my position, I need not rely solely on military authorities, for there are numerous civilian cases which uphold the foregoing proposition. In Richardson v Zuppann, 81 F Supp 809 (MD Penn) (1949), I find the following statement:

"The Fourth Amendment prohibits only unreasonable searches and seizures. 'There is no formula for the determination of reasonableness. Each case is to be decided on its own facts and circumstances.' In this case, 'In an occupied country under Military Government, a search and seizure deemed necessary by the highest military commanders, ordered by them to be conducted in the manner customarily employed by the military, with their orders relayed down the chain of military command, and executed in an orderly manner by military personnel, cannot be termed unreasonable.' I therefore conclude that petitioner's rights under the Fourth Amendment were not violated."

Grewe v France, 75 F Supp 433 (ED Wisc) (1948), upheld a search ordered by the commanding officer. There the trial judge commented:

". . . At the time involved, although open hostilities had ceased, it was highly essential that the commanding officer of our forces maintain strict discipline and control over the German population in that area, as well as over our own troops and those accompanying them. Underground opposition to our forces was almost to be expected. The situation was still tense and fraught with danger. In this setting petitioner was arrested in good faith. Under military law no warrant for his arrest was required. A search without a warrant was just as much in order as if the commanding officer had searched the barracks occupied by his troops. In fact, no courts from which a search warrant could be obtained were functioning. The Fourth Amendment condems [sic] only unreasonable search and seizure. Under the circumstances present the search of the government controlled premises occupied by the petitioner was not unreasonable."

Best v United States, 184 F 2d 131 (CA 1st Cir) (1950) is another case in which the court, after concluding the guarantees of the Fourth Amendment were available to the defendant, held a commanding officer could order a search when deemed necessary by him. The court stated:

". . . We are in agreement with the analysis and conclusion of the district judge in the following paragraph of his memorandum denying the motion to suppress, 76 F Supp at 864:

'Orders for the search of defendant's apartment and seizure of his property proceeded from the staff of the Commanding General of United States Forces in Austria, to the Commander of the 430th Counter Intelligence Unit, and down the line to his subordinates who executed the search. The military knew that Best was suspected of treason and had been engaged in broadcasting activities for the German Reich. (Affidavits of military persons concerned.) It is not for this court to say that defendant's papers did not constitute a threat to the safety of the military occupation, or that the means employed by the commander were not calculated to remove the threat. Here in the United States we can afford to pay, for the freedom from arbitrary police methods, the slight cost of an occasional unpunished offender. In Austria, the Military Commander would not find the bargain so desirable. The cost might be, not an unpunished criminal here and there, but an

enemy of the occupation forces spreading his influence into receptive channels, feeding the discontent of the population, organizing resistance movements, and hampering the reconstruction of a friendly state and the restoration of freedoms so recently destroyed by the Nazi regime. In this setting, in an occupied country under Military Government, a search and seizure deemed necessary by the highest military commanders, ordered by them to be conducted in the manner customarily employed by the military, with their orders relayed down the chain of military command, and executed in an orderly manner by military personnel, cannot be termed unreasonable. Thus defendant's rights under the Fourth Amendment were not violated.' "

Mr. Larkin, speaking for the Code Committee, notified members of the Armed Services Committee of the House that military law on search and seizure did not follow the civilian authorities. This is his statement:

"The rule on searches and seizures, for instance is not exactly the same as it is in a Federal court. It is, of course, applied where military personnel or their families are billeted in a home of their own, where a warrant would be required, but on camps, stations, and posts and so forth we do not follow the normal search and seizure. Frequently you could not find anybody to issue a warrant." [Hearings before House Armed Services Committee, 81st Congress, 1st Session, on H. R. 2498, page 1062.]

From the foregoing discussion, it is clear beyond question that a commanding officer has the authority to conduct or order the search of the personnel or property under his command apart from any pre-existing apprehension and without the necessity of obtaining a search warrant. Such a search is clearly "in accordance with military custom" and has been so recognized by the Army and Navy for a period of many years. Without doubt the prin-

ciple embodied in the quoted cases was the basis for the terminal provision of paragraph 152 of the Manual.

While the foregoing cases deal principally with searches of houses or living quarters, the theories expounded are equally applicable to searches of persons. Certainly the preservation of the home is as important a guarantee as protecting the sanctity of the wearing apparel, and it has long been recognized that the necessities of the services require a more liberal rule in searching persons.

Mr. Robinson Everett, in his work, Military Justice in the Armed Forces of the United States, 1956, page 103, calls attention to the well-established custom of searching military personnel:

"According to the Manual for Courts-Martial, a search may permissibly be conducted in accordance with military custom. The trouble arises in knowing exactly what falls within military custom. Probably the exemplar of this type of search is the 'shakedown inspection' to which a serviceman quickly becomes accustomed."

I do not contend a commanding officer has unlimited power to search members of his command, but I do assert he is not circumscribed by all the refinements applied in civilian cases. He has many occasions, other than searches to obtain incriminating evidence, which justify orders to search members of his command while on station. These are not present in the civilian community and, under any conceivable theory, it is only when his orders to search and seize cannot be considered reasonable that they are unlawful. What constitutes a reasonable search depends upon the facts and circumstances of each individual case, and in the military there are many factors which must be considered. United States v DeLeo, 5 USCMA 148, 17 CMR 148; Go-Bart Importing Co v United States, 282 US 344, 75 L ed 374, 51 S Ct 153; Harris v United States, 331 US 145, 91 L ed 1399, 67 S Ct 1098.

The word "reasonable" as it must be interpreted in military law is not

limited to those situations where the commander has probable [REDACTED] cause to believe a particular person possesses contraband and he alone can be searched. If it were so limited, then the civilian doctrine might be applicable. But it must be remembered that a commanding officer has the duty to maintain law and order and to protect the welfare, health, well-being, and safety of the command. He cannot sit idly by and await positive information that offenses are being committed. He has an obligation to prevent any misbehavior which will impair the efficiency and good order of his command. Surely the captain of a ship is not required to allow liquor or drugs to be smuggled aboard because he cannot fix with certainty the particular culprit. While a civilian can be denied the right to board the ship, under ordinary circumstances a member of its complement may not, and searching is the only effective way to reach the evil if the smuggling is being done by sailors. The same principle is involved when Army or Air Force personnel come on station. Therefore, in order to determine whether a commander has reasonable cause to order a search, consideration must be given to his duties and responsibilities to maintain a combat ready outfit, and his judgment should not be questioned unless he clearly abuses his authority.

As was stated by the Air Force Judicial Council in United States v Hopkins, 4 CMR (AF) 553:

". . . Because of necessities of the military service, he [the President] has substituted for the search warrant issued under civil law the authorization of a commanding officer who, by virtue of his very position, must be a person of discretion and responsibility; such authorizing officer is substituted for the independent judicial officer authorized to issue search warrants under civil law. It has been held that as there is in the Manual for Courts-Martial no requirement for anything like the affidavit of probable cause required by civil statutes, an appropriate commanding officer's exercise of discretion in authorizing a particular search cannot be questioned (ACM 1458, Worley, 3 CMR 424, 442)."

It remains then to be seen whether this commanding officer acted reasonably in ordering the search [REDACTED] of the returning soldiers. Not only do I believe he acted within reason, but I am of the opinion he would have failed in his duties to his command if he had not taken some affirmative action to prevent the importation of habit-forming drugs into his area. This search could have been justified on a protective theory alone. It is to be remembered that an officer in command of a military area in a combat zone on foreign soil has more reason to order searches of the individuals coming in and going from the area than would an officer stationed in the United States. In the case at bar, the unit was stationed in South Korea, and the illegal flow of narcotic drugs from North Korea and Communist China into the general area and eventually into the hands of American troops was a scourge with which commanders in that country had to deal, for:

"The Communists have planned well and know a well-trained soldier becomes a liability and a security risk from the moment he takes a shot of heroin." [The Traffic in Narcotics, Anslinger and Tompkins, 1953, page 95.]

The officer knew that heroin was destroying the combat efficiency of his command as, prior to the night in question, there had been two previous convictions of members of the unit arising out of the use and possession of the drug and a third man had been seized with narcotics on his person, only to escape prosecution because of an invalid chain of custody of the contraband. Other men in the unit were suspected of similar activity, and the condition was of sufficient notoriety that the officer had apprised his noncommissioned officers of the situation. At the time of the search, the suspects had been under surveillance for several months, and the commander's decision to make the search was prompted by

information that one of the suspects had borrowed ten dollars from a comrade. While this fact may appear rather unimportant, we must remember the circumstances in which it occurred. Necessities and proper merchandise were available through regular military outlets, the borrower had been suspected of narcotic offenses for some months, and the money was loaned immediately before the borrower would have an opportunity to deal with vendors of narcotics. Whether the commanding officer knew this particular accused was in possession of the contraband is unimportant. He had reason to believe someone in the group was involved in importing the drug, and his duty was to intercept the contraband. That it was found on the accused is unfortunate for him, but he may be likened to the citizen who seeks to smuggle contraband into this country. Each may be searched upon suspicion and, if they are caught, they must pay the penalty.

Viewed in the light of these facts, I not only find the officer had cause to order the search, but his alertness was commendable. As a commander, he stood responsible for the welfare of his men and simply took steps to protect them from the ravages of a widespread devastating and prevalent evil. Habit-forming drugs are ruinous to men and fatal to military organization. To deny a commanding officer the right to search men returning to their units after being exposed to drug peddlers in foreign countries is to cripple the services in their endeavors to protect their men and maintain peak combat efficiency.

It can, of course, be contended that the necessities of the service might permit searches to prevent importation of morale destroying goods but, unless there was good cause to search the particular person, the evidence cannot be used to support criminal prosecution. The answer to that contention is that if the only risk the smuggler takes is confiscation of the smuggled goods, he can well afford to take the chance—his loss on particular occasions would but constitute a cost of doing business, to be recouped in profits from his undis-

covered activities. I am not prepared to let him off that easily.

II

The other aspect of the majority opinion is equally contrary to my view. I encounter considerable difficulty in reconciling the statement that the accused was prejudiced by the law officer's alleged arbitrariness in curtailing argument, with the comment that the circumstances surrounding the matter argued are developed sufficiently "to permit an informed appellate judgment thereon." Moreover, apart from that inconsistency in the majority's approach, I deem it indeed unfortunate that the law officer is castigated for his ruling, and particularly is that true when, rather than being prejudiced, accused was, as I understand the law, accorded a distinct benefit.

I believe all members of the Court are genuinely interested in strengthening the role of the law officer and making him in the image of a Federal trial judge. Yet, opinions such as this eat away that possibility. A trial judge in a civilian court is not a mere figurehead who must bend with the will of the advocates. He is the master of the court and is entitled to require that cases be tried properly and expeditiously. He need not listen to every harangue proposed by counsel and, if he considers an objection premature and inappropriate, he need not have the jury confused and the record cluttered by a lot of immaterial argument. The same authority ought to inhere to a law officer in the military courts. If the judge or law officer is satisfied that there is no merit to the objection upon any legal ground, he is not required to allow counsel to expound on the objection. If he errs and there is any valid basis for excluding the evidence, he is subject to reversal providing the accused was prejudiced. In the case at bar, my associates assert the law officer's ruling was uninformed. I contend to the contrary and say he exhibited an understanding of the rules of evidence. The point at issue is simply this. An objection to the introduction of real evidence obtained by an al-

legedly illegal search and seizure should be made at the time the exhibit is offered in evidence. Before the offer can be made, if the article has been in several hands, a chain of custody must be established. This is a preliminary matter, and the question to which the objection was offered had only to do with forging the links in the chain of custody of the heroin. The objection made at that time was premature, and the law officer understood that for, when the containers were offered in evidence by trial counsel, the defense objected and assigned unlawful search as the predicate for the objection. Accordingly, it seems to me that the law officer is being criticized for requiring counsel to try the case properly.

For my second point of disagreement on this issue, I will assume the law officer erred. Based on that ▮▮▮▮▮▮ assumption, I assert the accused was benefited by the ruling. The authorities cited by the Court announce good rules of law which should be applied in the military, but they are inapposite in the present setting. The rule is, of course, that if an appellant seeks a reversal on appeal because of an erroneous ruling by a trial judge on an objection, he must have specified the grounds of his objection. Orderly procedure requires

the application of that principle because, for example, if it is contended the evidence is irrelevant, its relevancy can be shown at the proper time; if an assertion of incompetency of testimony is made, its competency can be established; and if the objection is based on the claim that secondary evidence is being used, a base for its admission can be established. It must not be overlooked, however, that there is a complementary rule which states the objector must, on appeal, rely on the specific basis he assigns in the trial forum. Interpreting the principles together, what is the position of this accused? Under the law officer's ruling, he was limited to a general objection. That makes it possible for him to attack the ruling on any ground. Instead of being limited to a specific reason for his objection, he has the entire field in which he can argue the evidence was inadmissible. If at the present time he could show this Court any ground for a legal objection to the question asked, he would win his point. He loses, in my view, not because he failed to assign the grounds for his objection but because it was not well taken by any rule of evidence.

For the foregoing reasons, I would affirm the decision of the board of review.