UNITED STATES, Appellee,

v.

Steven R. CHASE, Airman First Class, U.S. Air Force, Appellant.

No. 30,449.

U. S. Court of Military Appeals.

Jan. 30, 1976.

Major Bruce R. Houston argued the cause for Appellant, Accused. With him on the brief were *Colonel Jerry E. Conner* and *Colonel William E. Cordingly.*

Captain Frederick P. Waite argued the cause for Appellee, United States. With him on the brief were *Colonel C. F. Bennett* and *Captain Alvin E. Schlechter.*

## OPINION OF THE COURT

COOK, Judge:

At issue on this appeal is the legality of a gateway search at George Air Force Base, California, of a closed van belonging to the accused that led to the discovery of a motorcycle stolen from another airman.

On Friday night, August 30, 1974, Airman Conner of the Security Police Squadron was the security guard at the back gate of the base. On "a couple" of earlier occasions, he had been instructed by Staff Sergeant Cooper, his flight chief and superior, as to the "policy" for control of vehicles entering and leaving the base.

In material part, the instructions regarding outgoing vehicles were to "search every tenth car coming out, [and to] also concentrate on vans and campers" by searching all of them. The emphasis on the latter-type of vehicle was because they "are easy to use to stick items in and transport them." The search was to be general: as to cars, the guard would "just have the driver open up the trunk, doors, and that's about it"; as to vans, he would "just have them open up . . . the van doors and look inside." Incoming vehicles were to be "monitored" at night by checking bumper stickers and inspecting the ID cards of the drivers "to make sure they are allowed on base."[1] Conner had also been informed that the "object" of the vehicle search was to determine if a vehicle contained "contraband and government property."[2] His instructions were based upon a paragraph of an operations bulletin of the security squadron which, apparently, expressed the substance of a verbal directive of the base commander. The paragraph is as follows:

GATE GUARDS: If you see vehicles departing base with bicycles, write down bicycles description and vehicle license number, passing it on to SPI. Same applies to motorcycles being transported in vehicles. Vans and closed-bed trucks should be checked, traffic permitting, especially during hours of darkness. Too many bicycles are being stolen, not being seen again on-base, indicating they are being removed from the base. If you perform a search on a vehicle and high value items are present, write down description of article, serial number, and names of individual(s) in vehicle. With luck, we may be able to pin down some of the thieves on-base. You can use Contact Cards for recording the information as they are maintained on file and a theft may not be reported until a few days after it occurs. (SPI)

The first part of Conner's tour, which started at 11:00 p.m., was uneventful. At about 1:00 a.m., he received a telephone call from the security desk sergeant, who apprised him of the theft of a 10-speed bicycle and instructed him to "keep an eye out for it." "Because" of the report, Conner moved over to the "outgoing side of the gate" to watch for "anything out of the ordinary" in the traffic leaving the base. About 45 minutes later, a van with two occupants appeared at the exit side. Conner stopped it. The van belonged to the accused, and he was seated on the passenger side. Sergeant Tippler was the driver.[3] Although there are differences in his answers, the substance of Conner's testimony as to what transpired after he stopped the van appears in the following excerpts from the record of trial:

Q Now, would you again tell us what you said to the driver of the vehicle?

A I walked up to him, I said, "Good morning, sir. I am making a search of vehicles, would you step out and open up the back?"

. . . . .

---

1. At a point on the outside of the base, about 100 yards from the gate, on a road described as "Air Base Road," was a 6- by 8-foot sign, the text of which "let the personnel know that vehicles entering the base, their vehicles, and personal property were subject to search."

2. Staff Sergeant Cooper testified the search of exiting vehicles was also to check for "high value items."

3. Earlier, the accused had promised to give Tippler a "ride" downtown. When the accused arrived at their meeting place, he appeared to be ill, and he asked Tippler to drive.

Q Those are the exact words?

A Yes, sir.

Q Were any other words spoken with respect to that request?

A No, sir. I did ask him for his ID card, and that was about it.[4]

. . . . .

Q Is it customary to request ID cards from people exiting the base?

A Yes, sir, when they are being searched.

. . . . .

Q Now, following the receipt of the ID card from Airman Tipler [sic] and his exiting the vehicle, what occurred?

A We walked around to the back of the vehicle and he opened up the door for me.

. . . . .

Q Now when you saw this motorcycle without license plates, did that engender any suspicion in your mind that you were dealing with a stolen vehicle?

A No, sir.

. . . . .

A OK. Airman Chase got out of the van and came around to the back and he started saying that the bike belongs to a friend of theirs and gave a name. He said they were doing some welding on it and they are bringing it back to him now.

Q Did you believe that?

A Yes, it sounded legitimate at the time.

Q And what did you do then?

A I went up to the Desk to inform them that I was making out a contact card at the time.

Q Would you describe again what the contact card is?

A It's a card that has information on who was driving, what kind of vehicle it was, and why we made it out. We put it has a motorcycle in the back with identifying marks on it, and anything like that. If anything does come up on the motorcycle, that it is stolen or anything like that, then we will know who to refer to on it.

Q Now, is it your customary procedure to call the front desk to advise them that you are making out a contact card?

A Yes, that is something to cover myself in case something does happen when you are working a one man post especially.[5]

Before Conner could complete the contact card to record the incident, two security police officers, Airman Adams and Airman Lind, arrived on the scene, having been dispatched by the desk sergeant. Conner advised them he was checking out "a motorcycle" he had seen in the van, which had no license tag and for which he needed the serial number. Receiving an affirmative reply from Conner as to whether he needed help to find the serial number, Adams went directly to the van, and entered it from the front. Conner went to the rear of the vehicle and entered it from that end. He admitted he did not "request consent to go into the interior" from either Tippler or the accused.[6]

4. Tippler testified that at this time Conner told him he was "going to make a random vehicle check of the van because we have a report of a stolen 10-speed bicycle on the base." Although Conner admitted that, as a result of the report of the theft, he had positioned himself to monitor the outgoing traffic, and that he was "looking for this 10-speed bicycle," he denied that he mentioned the bicycle to Tippler as one of the objects of the intended search. The Court of Military Review did not believe it necessary to resolve the conflict.

5. According to Sergeant Cooper, there was no requirement that a guard notify the desk sergeant of his execution of a contact card.

6. Testifying as to the proper procedure in a situation such as that confronting Conner, Sergeant Cooper maintained that it was not "appropriate" to enter the van without "ask[ing] the individual permission first"; if permission was refused, "OSI or Security Police Investigations" would be called, and, in turn, they would determine whether to apply for "permission from the base commander to look in the man's vehicle," "assuming there was probable cause."

Affixed to the front of the cycle, Adams found a "For Sale" sign, which had a name and telephone number on it. The name did not correspond to that of the person the accused had said was the owner; Adams telephoned the desk sergeant to have him check the name and number. Some 4 or 5 minutes later, the desk sergeant reported that the motorcycle was "missing" from a parking lot. Tippler and the accused were then apprehended for "suspected theft."

At trial, and before the Court of Military Review, the Government contended that the seizure of the motorcycle and the accused's apprehension were legal on either of two grounds: (1) that Tippler and the accused consented to inspection of the van and entry into it; or (2) that what was done by the security policemen was reasonably allowable as part of a gateway search at a military installation. Without stating his reasons, the trial judge overruled defense counsel's objection to the evidence that led to the seizure of the motorcycle. The Court of Military Review sustained the ruling, primarily on the ground that "Tippler's ready assent" constituted consent, and, secondarily, because, irrespective of consent, the search and resultant seizure were proper because they were part of a lawful random gateway search.

In concluding that the search had been consented to, the Court of Military Review commented on "material variances" between Tippler's testimony and Conner's. Although the court indicated it did not need to resolve the conflicts, its affirmance of the trial judge's ruling requires that we consider the evidence in the light most favorable to the Government, even though we might, ourselves, have decided the conflicts differently had we factfinding authority as regards the issue. *United States v. Alaniz,* 9 U.S.C.M.A. 533, 537, 26 C.M.R. 313, 317

(1958). The picture that emerges from Conner's testimony, purged of its inconsistencies, convinces us that the trial judge's ruling, and the Court of Military Review's affirmance of it, cannot be upheld on the ground of consent to the search.

 Consent to a search is different from acquiescence in, or submission to, the assertion of apparent authority by a police officer. The former dispenses with the preconditions for a legal search; the latter does not. That Conner was polite in requesting Tippler to open the van doors does not lessen the force of his assertion of authority to inspect the interior. The preparatory amenity was immediately followed by Conner's announcement that he was making "a vehicle search" and his direction to Tippler to "get out of the van and open up the back." Conner conceded he had asked Tippler for his ID card, not as something Tippler could refuse, but because it was "customary" for an individual "being searched." His testimony leaves no doubt that he stopped and inspected the van on the basis of his authority as a security guard at the gate, not because he was allowed to do so by the accused. Even after the accused explained the presence of the motorcycle in the van, and the explanation was deemed "legitimate" by Conner, they were still not free to leave until Conner was ready to release them. Later, when Security Guard Adams arrived on the scene, he and Conner went into the van, without first asking Tippler, or the accused, whether they would allow them to do so, and contrary to the general limitations on the manner of conducting a gateway inspection. In our opinion, what was done by Conner and Adams cannot be justified on the ground that the accused or Tippler had consented to it.[7] *United States v. Mayton,* 23 U.S.C.M.A. 565, 50 C.M.R. 784, 1 M.J. 171 (1975).

---

7. To support its conclusion that the search was consented to, the Court of Military Review relied upon our decision in *United States v. Glenn,* 22 U.S.C.M.A. 295, 46 C.M.R. 295 (1973). *Glenn* is inapposite. There, the accused and a passenger in his vehicle testified that the accused was "asked permission to search" his car, and he agreed. Here, Conner ordered Tippler to get out of the van and open the back doors. His words and action left Tippler, as he testified, with no alternative but to comply. Further, in *Glenn* the circumstances indicated, and the trial judge could have found, that the accused believed that the contraband in his possession was so concealed that he could allow the search, anticipating

■ At trial, the court took judicial notice of paragraph 3–4, Air Force Regulation 125–37 [USAF Resources Protection Program] (Dec. 21, 1973), and paragraph 3–4e, Tactical Air Command Supplement 1, AFR 125–37 (May 16, 1964).[8] Paragraph 3–4 of the regulation authorizes gateway inspections of "any vehicle entering or departing" the installation, with selection of the vehicle "on an impersonal [random] basis." What stands out most clearly is that Adams and Conner did not proceed as authorized by the Air Force regulation or the operations bulletin. The regulation is expressly designed to safeguard "USAF resources," not private property. The operations bulletin can be construed as expanding the inspection system to include examination of the contents of all vans and closed vehicles for private property of "high value" to reduce the number of thefts on base. So construed, the inspection would not be a means to safeguard the Government's own property, but a procedure to discover evidence of a crime involving private property. Testimony by Sergeant Cooper supports this interpretation of the bulletin. He states that the policy of inspection of closed vans was "initiated" because of the recent thefts of motorcycles; it was "believed" the stolen items were being taken off base, and the inspection system would discourage future

thefts, or, at least, enable the security squadron, in the language of the bulletin, "to pin down some of the thieves on-base." Carried out for this purpose, inspection of all vans appears as a dragnet police tactic, which is impermissible. *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); *United States v. Brown*, 10 U.S.C.M.A. 482, 28 C.M.R. 48 (1959).

Neither Adams nor Conner knew that the motorcycle had been stolen, and Conner expressly admitted that, although he had noted the absence of a license plate on the motorcycle and the accused had no registration for it, the "answers they gave me did not lead me to believe the vehicle was stolen." Sergeant Cooper testified there was "no way" he would have entered the vehicle. Whatever authority Conner and Adams may have had, if any, to detain the van for the purpose of verifying its registration and ownership, there was no authority to enter it for the purpose of examining its contents. We conclude, therefore, that the search of the interior of the van was illegal. Consequently, the evidence obtained from the "For Sale" sign affixed to the front of the motorcycle was inadmissible; so, too, was the evidence obtained through exploitation of the illegally obtained matter. *United States v. Armstrong*, 22 U.S.C.M.A. 438, 47 C.M.R. 479 (1973).

that the contraband would not be discovered. Here, the "For Sale" sign was certain to be discovered if entry into the van was allowed, and the name on it would immediately cast great doubt, as it did, upon the accused's explanation for his possession of the cycle. These circumstances argue strongly against consent. *See Higgins v. United States*, 93 U.S.App.D.C. 340, 209 F.2d 819 (1954).

8. AFR 125–37, paragraph 3–4, states:
Inspection of Motor Vehicles Entering or Leaving an Air Force Installation. A commander may direct the inspection of any vehicle entering or departing an installation under his jurisdiction, whether the owner or operator is military or civilian.
 a. Vehicles to be inspected will be selected on an impersonal basis, using an arbitrary formula—such as "every other car." That is, individual cars should not be singled out for inspection unless there is reason to believe that a specific vehicle may be carrying contraband items.

b. The refusal by the owner or driver to submit to this inspection on entering an installation is legal cause to deny the vehicle entry. Physical force may not be used to enter a vehicle when permission to inspect has been denied. However, the commander may detain the vehicle and deny exit until the individual complies, or he may deny future on-base driving privileges, including cancellation of base entry for any vehicle owned or operated by the individual.
c. If the installation commander has reason to believe government property is contained in the vehicle without proper authority, which cannot otherwise be recovered, he may, after consultation with the nearest US Attorney, cause the locked compartments to be forced open.
TAC Supplement 1, paragraph 3–4e states:
A warrant from the installation commander is required for the search of a specified vehicle when it is suspected that the evidence being sought is in fact in the specific vehicle.

The decision of the Court of Military Review is reversed. The findings of guilty and the sentence are set aside. As there appears to be no admissible substitute for the excluded evidence, the Charge is dismissed.

Chief Judge FLETCHER and Senior Judge FERGUSON concur.