UNITED STATES, Appellee

v

WILLIAM WESTMORE, Sergeant, U. S. Army, Appellant

14 USCMA 474, 34 CMR 254

No. 17,240

April 3, 1964

*First Lieutenant Clifford B. Hearn, Jr.,* argued the cause for Appellant, Accused. With him on the brief were *Colonel Joseph L. Chalk, Captain Daniel H. Benson, Captain Joseph M. Livermore,* and *Captain Ronald L. Gainer.*

*First Lieutenant Barrie G. Sullivan, II,* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Francis M. Cooper.*

## Opinion of the Court

FERGUSON, Judge:

Arraigned and tried before a general court-martial convened by the Commanding General, VII Corps, United States Army, at Stuttgart-Moehringen, Germany, the accused was found guilty of two specifications of attempted larceny, two specifications of larceny, and twelve specifications of uttering worthless checks, in violation of Uniform Code of Military Justice, Articles 80, 121, and 123a, 10 USC §§ 880, 921, 923a. He was sentenced to bad-conduct discharge, forfeiture of all pay and allowances, confinement at hard labor for two years, and reduction. Intermediate appellate authorities affirmed, and we granted accused's petition for review upon issues dealing with the lawfulness of a search of his effects and the failure of the law officer to instruct, *sua sponte,* on proffered defenses of alibi and good character. In view of our action with respect to the question of search and seizure, we do not reach the other contentions of the accused.

Briefly, the record purports to establish that accused, on October 2, 1962, by using a false identification card application, opened a checking account in the name of William A. Jones at the American Express Company's Vaihingen Branch Office. One hundred dollars was deposited in this account. On the same day, accused cashed a check in the amount of $75.00 at Mannheim, Germany. Subsequently, between October 2, 1962, and October 11, 1962, he uttered fifteen checks at various locations throughout Germany in amounts ranging from $27.38 to $225.00.

On October 12, 1962, Sergeant Westmore, wearing a nametag identifying himself as "Jones," entered the American Express office at Kelley Barracks. He placed a check purportedly signed by "William A. Jones" on the counter and, after some delay, was taken into

**475**

custody. He was transported to the local military police station. There, he was advised of his rights under Code, supra, Article 31, 10 USC § 831, and informed · that he was suspected of passing bad checks.

In mid-afternoon, accused was taken to the Criminal Investigations Detachment office at Robinson Barracks. He was again informed of his rights and questioned for approximately ninety minutes by Agent Roberge. Roberge told the accused he "would like to go to Nellingen, to his barracks there, . . . that I wanted to check his own personal belongings." Westmore rode in a jeep, in the custody of a Military Police patrol, and Roberge followed in his own vehicle. Accused "took us" to his room, and at Roberge's request, pointed out his locker.

After Roberge began to search the locker, accused declared that "he would like to see the items I removed." Roberge accordingly placed them on the bed on which accused was sitting.

While the search was in progress, accused's unit commander, Major Nachtsheim, entered the room and asked "what was taking place." Roberge identified himself, "explained that I was there to check the accused's personal belongings." He and Nachtsheim then stepped into the hall, where the following transpired:

"A. I explained to the Major that the accused has been apprehended at Kelley Barracks, suspected of passing or attempting to pass a worthless check, . . .

. . . . . 。

". . . I told him I was checking his personal belongings for possibly a checkbook which was part of the checks, in order to see if there was any checkbook there, and then Major Nachtsheim said, 'O. K.' and I believe I went back into the room and continued the search, and Major Nachtsheim requested that I give him a complete briefing when it was completed, sir."

According to Major Nachtsheim, he just saw Agent Roberge in "Sergeant Westmore's room, conducting a search." The bed "was pretty well scattered with clothing and papers . . . [and Mr. Roberge] had a hand full of papers and he was sorting them out and looking at each one."

Nachtsheim asked Roberge "what he was doing in Sergeant Westmore's room." Roberge informed him "he was conducting a search and that Sergeant Westmore had been apprehended for some offense." Nachtsheim inquired "was this with Sergeant Westmore's consent, and he said that apparently it was." Roberge did not then state the nature of the offense for which Westmore had been apprehended. However, after leaving accused's room, the agent told Nachtsheim that accused was involved in "an alleged check cashing forgery or something." The Major declared that Roberge said nothing else which he could recall. He further explained:

". . . It was a very quick conversation. I was hot and sweating, just came in off the practice field. I was a little upset. It's not humorous, but I was upset because I was afraid I had lost my star halfback, and I was also upset to find this CID agent in my billets without my knowledge. But the conversation was friendly and he told me that this had become official business and that Sergeant Westmore was in custody, and that was it."[1]

Seized during the search and admitted in evidence over proper defense objection were numerous exhibits, which included money order receipts and an application for another identification card in the name of Curn. Roberge was uncertain whether some of the exhibits had been taken from accused's person after his initial apprehension or from his locker during the search in question.

Before us, the Government urges that the search be upheld either on the basis of consent by the accused or upon au-

---

[1] In the interest of clarity, it should be noted that accused's "duty" consisted of playing football and Major Nachtsheim was his coach as well as his commanding officer.

thorization by his commanding officer, Major Nachtsheim.

As to the former proposition, we find not the slightest basis in the record for even inferential agreement ▇ by the accused that his personal belongings might be examined by Roberge. The latter's testimony goes no further than to indicate that he informed accused he would "like to" search his effects and that, at his request, Westmore furnished directions to his barracks room and pointed out his locker. Indeed, in speaking to Nachtsheim, Roberge declared only that accused "apparently consented," and there is simply no evidence that he in any way expressed his assent to the procedure followed.

In United States v Justice, 13 USCMA 31, 32 CMR 31, we pointed out, at page 33:

> "When consent to a search is asserted, it must be shown by 'clear and positive testimony.' United States v Berry, 6 USCMA 609, 20 CMR 325. The burden of proof is upon the Government. It is an especially heavy obligation if the accused was in custody at the time he purportedly gave his consent. Judd v United States, 190 F2d 649 (CA DC Cir) (1951); United States v Wallace, 160 F Supp 859 (DC) (1958), cited with approval in United States v Alaniz, supra [9 USCMA 533, 26 CMR 313]. Mere submission to the color of authority of law enforcement officers, or acquiescence in the officers' announced or indicated purpose to search, is not consent." [Emphasis supplied.]

In United States v Berry, 6 USCMA 609, 20 CMR 325, we likewise pointed out that it must clearly appear that the accused consented to the search and went on to state, at page 613:

> ". . . The burden of establishing consent is on the Government. Acquiescence or mere submission to authority is not equivalent to consent. Johnson v United States, 333 US 10, 92 L ed 436, 68 S Ct 367."

See also United States v Wilcher, 4 USCMA 215, 15 CMR 215; Johnson v United States, 333 US 10, 92 L ed 436, 68 S Ct 367 (1948); Amos v United States, 255 US 313, 65 L ed 654, 41 S Ct 266 (1921); and United States v Cook, 1 CMR 850.

The Government argues, however, that accused's silence in face of Roberge's actions and statement ▇ to Major Nachtsheim ▇ that he "apparently consented" may reasonably be construed as establishing consent rather than mere acquiescence. We unqualifiedly reject any such contention. At the time, the accused was in custody and under no duty to dispute any statement by the officer. Cf. Manual for Courts-Martial, United States, 1951, paragraph 140a, page 251. Moreover, the burden is upon the United States to establish the existence of consent. United States v Justice, supra; United States v Berry, supra. Such is not demonstrated by proof that he was told a search was desired and that he thereafter acquiesced in the announced purpose of the officers. Johnson v United States, supra; Amos v United States, supra. The only meaning which can be drawn from Roberge's statement that Westmore "apparently consented" is the latter's peaceful submission to the agent's authority constituted a proper basis for the examination of his belongings. That it does not, however, is made clear by the authorities set out above and, adhering to their rationale, we hold there is no showing of consent made in this record.

The Government next seeks to divide the search into what occurred prior to Major Nachtsheim's arrival and what happened thereafter, arguing that, as to the latter, the search was carried out upon the authorization of accused's commander. There are a number of faults in this approach.

First, we are disinclined to hold that this search, in view of the facts presented concerning the ▇ times at which the incriminating exhibits were located, may be so partitioned. And ratification of a search is not the equivalent of its authorization. United States v Sessions, 10 USCMA 383, 27 CMR 457.

Secondly, we find no indication that Major Nachtsheim authorized the search or that he was pre- █ sented with evidence of probable cause to justify such action on his part. The evidence shows only that he unexpectedly arrived at the barracks and, confronted with the presence of military police actively engaged in the search of a place under his control, understandably demanded information concerning what was transpiring. He was told this was an "official" matter; that accused was suspected of passing bad checks; and that the search was being made to uncover possible instrumentalities of the crime.

At no time did Major Nachtsheim purport to authorize the search in question. According to his own testimony, the conversation with Roberge was brief; he was upset over the possible loss of a football star; and he merely asked that he be given "a complete briefing." In short, as the Major expressed it, "Sergeant Westmore was in custody, and that was it."

Nor did Roberge furnish Nachtsheim with any information upon which a determination of the existence of probable cause might be predicated. Johnson v United States, supra; United States v Brown, 10 USCMA 482, 28 CMR 48. In United States v Battista, 14 USCMA 70, 33 CMR 282, we pointed out that the fact an accused was suspected of an offense is not enough to establish probable cause to search his effects. And in United States v Davenport, 14 USCMA 152, 33 CMR 364, we held that communication of conclusory information to a commander that the accused was the guilty party and had the stolen property in his possession was "an insufficient basis for a finding . . . of the existence of probable cause." See also United States v Ness, 13 USCMA 18, 32 CMR 18, and Jones v United States, 362 US 257, 4 L ed 2d 697, 80 S Ct 725 (1960).

A fortiori, the mere statement by a criminal investigator that an accused is in custody, suspected of █ passing worthless checks, does not establish facts from which a commander might find

probable cause to exist. United States v Ness; United States v Davenport, both supra. Had Agent Roberge communicated the matters then within his knowledge to Major Nachtsheim, probable cause may well have been made out, but he satisfied himself with informing Nachtsheim only of his suspicion of the accused, the fact that he was under arrest, and what he hoped to uncover. Compare United States v Castle, 138 F Supp 436 (DC DC) (1955); United States v Pepe, 209 F Supp 329 (DC Del) (1962); United States v Elliott, 210 F Supp 357 (DC Mass) (1962); and United States v Betz, 205 F Supp 927 (DC Mich) (1962).

For the stated reasons, we conclude that no case is made out on this record for the authorization by Major Nachtsheim of a search of the accused's effects. The law officer, therefore, erred to accused's prejudice in admitting the questioned exhibits, and reversal is accordingly necessitated.

The decision of the board of review is reversed, and the record of trial is returned to The Judge Advocate General of the Army. A rehearing may be ordered.

Judge KILDAY concurs.

QUINN, Chief Judge (dissenting):

Although I agree there was neither consent nor authority for the search of the accused's locker, I am unable to join my brethren in reversing the findings of guilty, because, in my opinion, the other evidence of guilt is overwhelming. See United States v Justice, 13 USCMA 31, 32 CMR 31.

The evidence shows the accused opened an account in the Vaihingen Branch of the American Express Company on the morning of October 2, 1962, with a deposit of $100.00. No other deposits were made, but between the afternoon of October 2 and October 12, a number of checks were issued in a total amount in excess of $1,100.00. The accused was specifically identified as the person who represented himself as the drawer and the payee on three of the checks, and for identification, he presented an application for an ID card

in the name of William Jones. There is substantial other evidence to show the accused was the person who opened the account in the name of Jones, and the person who issued the checks in that name. A handwriting expert testified that the application and signature card on file in the bank for the Jones' account, a deposit slip in the name of "Westmore," which was obtained in the search of accused's locker but to which no objection on the ground of illegal search was made, and known handwriting exemplars of the accused were "probably" made by the same person.[1] When the accused was apprehended, a search of his person uncovered six money order receipts in various amounts issued during the period in question. No objection was made to the admission of three of these receipts, and the objection to the other three was properly overruled since they were obtained in the course of the search incident to the accused's arrest. In light of this mass of evidence, the items of evidence obtained as the result of the search, to which objection was made, are insignificant and unimportant. I am, in fact, surprised trial counsel persisted in his efforts to have them admitted into evidence. They consist of the following: Three other money order receipts, two in the amount of $100.00 and one for $10.00; all were dated October 8, 1962. There was also an objection to the admission into evidence of the application for an ID card in the name of Curn, but it was merely on the ground of relevancy, not illegal search and seizure, and it was properly overruled. I would affirm the decision of the board of review.

---

[1] The witness defined the probability as within the range between "90 and 100 percent certainty." He did not make "positive identification" only because of the limited number of known exemplars of accused's handwriting available to him for comparison.