UNITED STATES, Appellee

v

WILLIAM CARSON, Specialist Four, U. S. Army, Appellant

22 USCMA 203, 46 CMR 203

*Captain Thomas Barry Kingham* argued the cause for Appellant, Accused. With him on the brief was *Colonel Arnold I. Melnick.*

*Captain Gordon F. Bailey, Jr.,* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Ronald M. Holdaway, Major Thomas P. Burns, III, Captain Richard L. Menson,* and *Captain Merle F. Wilberding.*

## Opinion of the Court

DARDEN, Chief Judge:

The result of appellate review in this case depends on the legality of a search in the Sixth Aerial Port Passenger Terminal, U-Tapao Air Base, Thailand, that produced marihuana used as evidence to convict the accused.

At the trial, defense counsel moved to suppress evidence that was seized as a result of what he termed an illegal search. After the accused pleaded not guilty, the trial counsel called Technical Sergeant Denningham, the noncommissioned officer in charge at the U-Tapao Terminal on the date of the search.

Sergeant Denningham testified that at about 5 p.m. on the date of the search three persons brought their baggage and handbags into the terminal. The accused and Specialist Hamilton "brought in a duffle bag apiece plus a small hand-carried bag and a hangup bag and the other Army man brought in just a plain small handcarried bag."

After entering the terminal, the three persons approached the information counter and looked at the schedule of arrivals and departures. Overhearing them ask about aircraft going to Okinawa or Guam, Sergeant Denningham became "alarmed," entered the conversation, and asked to see their identification. At this point, they produced ID cards and orders that appeared to be regular. They filled out "booking cards" for a flight to Okinawa, and a copy of their orders was attached to the booking cards. Sergeant Denningham noted that the three persons were authorized 30 days' leave and that their leave had just started. He told them that they should appear for the flight between 6 and 8 o'clock, that departure was normally at 9:30, and that they should show up at the terminal scales, where their baggage would be taken and they would be given a card or ticket.

After noticing that the three had what he considered an unusual quantity of baggage, Denningham asked if they did not like Thailand. One of them replied that it was expensive and that they had spent about $80 in taxicab fare. A check of the records showed that the names of the three appeared in sequence on a flight into Thailand from Okinawa less than 24 hours earlier. Sergeant Denningham testified he thought it unusual that these persons would come that distance with that amount of baggage and want to return to Okinawa in less than 24 hours. He also testified that the duffel bags were not normal in appearance, but "solid . . . firm

. . . as full as [they] could be right up. to the top . . . like they were blown up with air."

Specialist Hamilton sat near the baggage and the accused went to the end of the terminal. Both of them soon fell asleep. While walking by to get a drink of water, Sergeant Denningham touched one of the bags and it felt like sawdust. He said he could smell mothballs and hear plastic crinkle. His experience caused him to think that the bag contained contraband. According to the Sergeant, as required by directives and messages from higher levels of Air Force command, he called the air police.

Denningham requested that a Sergeant Glenn, a dog handler assigned to check the baggage on all outgoing flights, be sent to the terminal. Sergeant Denningham explained that the normal check of baggage was made from 7 to 7:30 each day and that usually the dog was used to sniff baggage after it had been checked through the scales but that the dog handler would "walk around the terminal and check everyone in the terminal with any type of baggage."

Sergeant Glenn testified and described his training and practice in using dogs to detect marihuana. He related that the dog he used on this day, King, alerted at the duffel bags after Sergeant Glenn had requested the men to spread their baggage out. Sergeant Glenn agreed with Sergeant Denningham that normally he and King checked baggage after it had passed through the scales but that occasionally he checked passengers in the terminal who were on the waiting list. He gave the accused and Specialist Hamilton no warnings under Article 31, Uniform Code of Military Justice, 10 USC § 831, before he asked them to identify the baggage but he did warn them after King alerted. He asked if they would open the baggage but was told that they did not have the keys.

Colonel Temple, the vice commander of the 635th Combat Support Group at U-Tapao, testified that he entered the terminal at about 6 o'clock and that a Colonel Witt explained to him that they had a case of suspected marihuana possession. Colonel Temple described the duffel bags as appearing "very concentric, rounded" and "fully packed." He was not asked specifically for authorization to search the baggage but a "base commander is authorized to search baggage like at the aerial port." In addition, a sign in the terminal warned that anyone that is going out on a SAC aircraft is subject to having his baggage searched.

Special Agent Bush of the Office of Special Investigations testified that he received instructions from Lieutenant Jones to accompany him to the terminal and after arrival discussed the situation with both Sergeant Denningham and Sergeant Glenn. Following this discussion, Agent Bush interviewed the accused and the two other persons involved and advised them of their rights under Article 31. In response to a question, they declared that the bags belonged to them. When Agent Bush asked permission to open the locked bags, permission was denied with the explanation that the keys to the bags had been lost. He authorized security police to cut the locks and to open the bags. Material identified as marihuana was found inside.

Agent Bush stated that in ordering the bags to be opened he was acting (1) under authority of "official Air Force regulations that state that baggage which is to be loaded on Air Force aircraft . . . can be searched"; and (2) on the knowledge and consent of the acting base commander, Colonel Temple. In explaining the "consent" of Colonel Temple, Agent Bush acknowledged that the Colonel had not given him specific authority to search, but stated that he felt he had been authorized by him to open the bags while the Colonel was in the terminal.

The military judge ruled that the search and seizure was legal but that the statements made to Sergeant Glenn were inadmissible for any reason.

When an accused questions the legality of a search, the Government has the burden of showing that the search was lawful or that for some other reason it did not render the evidence in question inadmissible against the accused. United States v Berry, 6 USCMA 609, 20 CMR 325 (1956); paragraph 152, Manual for Courts-Martial, United States, 1969 (Rev ed). At the trial, the Government sought to sustain the search as one resting on the inherent power of the base commander to take actions of this type to protect his installation and aircraft. Before us, the Government relies more on an analogy to the so-called "customs-like" search recognized in United States v Greene, 44 CMR 420 (ACMR 1971), *petition denied,* 21 USCMA 619, 44 CMR 939 (1971).

Generally speaking, searches of an individual service member's property must be authorized by his commanding officer on probable cause to believe that he is in possession of the items which are being sought. United States v Davenport, 14 USCMA 152, 33 CMR 364 (1963). There are exceptions to this rule, most of which are not pertinent to the situation presented here. The discussion of searches and seizures in paragraph 152, Manual, supra, does not discuss a "customs-like" search, but does indicate that the examples of lawful searches that it sets forth are not intended as a limitatio·.. upon the legality of searches that are otherwise reasonable under the circumstances. Accordingly, we must decide whether this search was reasonable under the circumstances presented and thus consistent with the Fourth Amendment as it applies to searches of members of the armed forces.

Since the beginnings of the Republic, searches by customs authorities on the boundaries of this nation have been authorized without regard to probable cause or warrants. See the discussion in Carroll v United States, 267 US 132, 69 L Ed 543, 45 S Ct 280 (1925). It has been held that these searches are not limited strictly

to the border area, if the defendant's activities are reasonably related to that area. United States v Glaziou, 402 F2d 8 (2d Cir 1968), *cert denied,* 393 US 1121, 22 L Ed 2d 126, 89 S Ct 999 (1969). In United States v Greene, supra, the Army Court of Military Review likened a search occurring at the same air terminal as is involved here to one of these long approved customs searches. In *Greene,* the accused had placed his luggage on the terminal's baggage scales and begun to attach tags. The Court of Military Review, after noting that military searches generally must be authorized on the basis of probable cause, nonetheless held that the inspection resulted from a justifiable attempt to interdict the flow of drugs from Thailand and that the examination of the accused's luggage did not constitute an unreasonable invasion of his privacy. The court relied on the statement in United States v Kazmierczak, 16 USCMA 594, 600, 37 CMR 214, 220 (1967), that "there are occasions when the individual's right of privacy yields to the Government's right to perform a proper public function." We agree with the result in *Greene* but our agreement does not control the decision in the case before us.

Assuming for the purposes of this opinion that, as a "proper public function," military commanders may require a baggage examination of persons traveling on military aircraft, we must still determine the point at which this type of search may reasonably be conducted. Granting that customs searches or "customs-like" searches are not limited precisely to the border area, see United States v Glaziou, supra, our attention is not called to any authority for conducting a search without probable cause of a suspect *prior to* the time that he enters that area or submits his baggage for examination. Authority for that proposition would mean that an officer could search a person without probable cause "no matter where he was in the United States." United States v Glaziou, supra at 14 n 3, and would

completely negate the protection against unreasonable searches and seizures.

■ In the present case, we conclude that the accused had not yet reached the point at which his baggage became subject to inspection. He had entered the terminal, inquired about the availability of transportation, and had signed a request that he be provided that transportation. But he also retained physical control over and possession of his baggage. He was not required to check in for the flight until the early evening. In the intervening period, he could have changed his mind about making the flight. For example, he might have considered his decision in light of the posted warning that his baggage was subject to inspection.[1] He was not finally committed to the flight and, for practical purposes, was in the same status as any other person lawfully on a military base or lawfully within a military building.

In our view, a member of the armed forces in these circumstances does not commit himself to a flight and subject his baggage to inspection until he delivers the baggage for weighing or handling by others at the check-in point. Until that time, he retains his right of privacy that can be abridged only upon a showing of probable cause, determined by an authorized official, or by demonstration of one of the exceptions to the probable cause requirement. We see no basis under *Greene* for concluding that the search in this case was lawful.

■ Turning to the contention that the search was authorized on probable cause by Colonel Temple, we find nothing in the record to support that conclusion. Assuming that probable cause to search existed, Agent Bush concededly did not obtain Colonel Temple's authorization to search. Colonel Temple's presence at the terminal during the police activity was insufficient to confer authority to search on Bush, and it does not appear that he otherwise did so, either impliedly or expressly. See United States v Westmore, 14 USCMA 474, 34 CMR 254 (1964). Consequently, it was error for the military judge to receive the fruits of the search in evidence, and we must reverse the decision of the Court of Military Review.

The decision of the United States Army Court of Military Review is reversed as to the Additional Charge, and the record of trial is returned to the Judge Advocate General of the Army. A rehearing may be ordered on the Additional Charge and the sentence.

Judge DUNCAN concurs.

QUINN, Judge (dissenting):

In United States v Volante, 4 USCMA 689, 691–692, 16 CMR 263, 265–266 (1954), we pointed out that "not every search made by persons in the military service" can be attributed to the Government so as to make the search subject to the constitutional prohibition against unreasonable search and seizure. We held that a search of the accused's locker by fellow exchange personnel senior in rank to the accused did not constitute Government action. My view of the evidence in this case convinces me that Sergeant Denningham's position at the U-Tapao Terminal was not such as to charge the Government with responsibility for his conduct in touching the accused's bag. See Clayton v United States, 413 F2d 297 (9th Cir 1969), *cert denied*, 399 US 911, 26 L Ed 2d 565, 90 S Ct 2204 (1970).

When Sergeant Glenn of the security police squadron was informed by Denningham about what he learned of the accused's luggage and travel, Glenn could not reasonably be expected to shrug his shoulders and wait. On the contrary, common sense and sound police practice demanded that he do something. Adams v Williams, 407 US 143, 32 L Ed 2d 612, 92 S Ct 1921 (1972).

---

[1] In this case we do not reach the question of whether a military passenger consents to a search of his baggage by accepting free Government transportation while on leave.

Terry v Ohio, 392 US 1, 20 L Ed 2d 889, 88 S Ct 1868 (1968), postulates that in such instances a balance must be struck between the constitutional sanctity of the individual's person and effects, and the imperatives of police investigation to prevent crime and apprehend criminals. The Court stressed that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." 392 US at 22. It sustained a pat-down of the defendant's person for weapons as a reasonable measure in the circumstances of the case. Cf. Sibron v New York, 392 US 40, 20 L Ed 2d 917, 88 S Ct 1889 (1968). Here, Sergeant Glenn may not have had probable cause to arrest the accused for possession of marihuana on the basis of Denningham's report, but he had enough information to require him immediately to investigate. I believe the action he took was eminently reasonable and appropriate, and was as limited an intrusion into the accused's privacy as the circumstances allowed. He walked by the bags with a dog trained to detect marihuana. Terrell v State, 3 Md App 340, 239 A2d 128 (1968). See also United States v Ponder, 45 CMR 428, 433–435 (AFCMR 1972). When the dog confirmed Denningham's report, there was, in my judgment, probable cause to arrest the accused, and make a full, visual examination of the bag. I conclude, therefore, that the balance between individual privacy and sound police work was properly struck in this case. I would uphold the trial judge's ruling admitting the results of the search in evidence, and affirm the decision of the Court of Military Review.