UNITED STATES, Appellee,

v.

Tony WALLACE, Specialist Four, U.S. Army, Appellant.

No. 38,955/AR.

SPCM 14075.

U.S. Court of Military Appeals.

Aug. 24, 1981.

For Appellant: *Captain Dennis E. Brower* (argued); *Colonel Edward S. Adamkewicz, Jr., Lieutenant Colonel John F. Lymburner, Major Grifton E. Carden* (on brief); *Major James F. Nagle.*

For Appellee: *Captain Robert D. Higginbotham* (argued); *Colonel R. R. Boller, Major Ted B. Borek, Captain Harry J. Gruchala* (on brief); *Major John T. Meixell.*

OPINION OF THE COURT

COOK, Judge:

At a special court-martial bench trial in Frankfurt, Germany, Judge Gilligan convicted the accused of wrongful possession of methamphetamine, in violation of Article 92, Uniform Code of Military Justice, 10 U.S.C. § 892, and adjudged a sentence which included a bad-conduct discharge. The accused contends the judge erred in admitting into evidence testimony by his unit commander, Captain Spiker, of discovery of the substance during a search of a

suit carried by the accused. We sustain Judge Gilligan's ruling, and affirm the decision of the United States Army Court of Military Review.

## I. THE BASES OF THE JUDGE'S RULING.

■ After hearing testimony from three witnesses as to the circumstances of the search, Judge Gilligan ruled that "the Government has clearly shown that there was lawful consent" to the search. In what the judge described as a "back up approach," he further ruled the search was sustainable as either a "probable cause search authorized by a commander or . . . [as a] search incident to an apprehension." The first of the "back up" grounds is clearly erroneous [1]; the second requires a balance of factors that can appropriately be put aside [2] because we are convinced that the ruling on consent is supported "by the evidence of record . . . [and is not] clearly

1. During after-duty hours, and while in the apartment of another officer, Captain Spiker received a report from an informant that the accused was in his room in Coleman Kaserne and was in possession of a prohibited substance, which he described as "speed." He immediately went to the kaserne, to "see" the accused "for the purpose of conducting a search." The informant had had 10 to 12 prior contacts with the captain involving other persons, and the captain had apparently responded to each of these. The ineluctable conclusion is that Captain Spiker was personally and deeply involved in investigating drug activities in the unit. "[C]onsidered in tandem with his" direct search of the accused, there is no factual support for the trial judge's implicit conclusion that Captain Spiker qualified as a "neutral and detached magistrate" empowered to authorize a search. *United States v. Rivera,* 10 M.J. 55, 61 (C.M.A.1980); *United States v. Staggs,* 23 U.S.C.M.A. 111, 48 C.M.R. 672 (1974); *see United States v. Middleton,* 10 M.J. 123, 135 n.23 (C.M.A.1981).

2. As indicated in note 1, Captain Spiker had at least moderate experience with the search process. The fair inference from this experience is that he was aware of, and knew, the significance of common words of art that obtain in that area of law. Two common phrases are "probable cause" as distinguished from "mere suspicion" and "consent" as distinguished from "acquiescence."

The "apprehension" of a person in the military must be "upon reasonable belief that an offense has been committed and that the person apprehended committed it." Article 7(a),

erroneous." *United States v. Middleton,* 10 M.J. 123, 133 (C.M.A.1981).

## II. THE RELEVANT CIRCUMSTANCES.

■ Of the three persons who testified regarding the search, two, Captain Spiker and Special Agent Sells, were government witnesses; the third, Private Trice, testified for the accused. In some particulars, the testimony of Spiker and Trice conflict. As determination of the credibility of witnesses is peculiarly for the factfinders and both Judge Gilligan and the convening authority upheld the search on the ground of consent, we are bound to view "the facts in the light most favorable to the Government." *United States v. Middleton, supra. See United States v. Decker,* 16 U.S.C.M.A. 397, 401–02, 37 C.M.R. 17, 21–22 (1966).

On Saturday evening, November 11, 1978, Captain Spiker received a telephone call

(b), Uniform Code of Military Justice, 10 U.S.C. § 807(a), (b). The requirement that there be "reasonable grounds to believe that the person to be arrested has committed a felony" is generally expressed by the phrase "probable cause." *United States v. Watson,* 423 U.S. 411, 417, 96 S.Ct. 820, 824, 46 L.Ed.2d 598 (1976); *United States v. Paige,* 7 M.J. 480, 484 (C.M.A. 1979). At no time before the search did Captain Spiker indicate to the accused that he was under apprehension. *See* para. 19c, Manual for Courts-Martial, United States, 1969 (Revised edition); *United States v. Kinane,* 1 M.J. 309, 314 (C.M.A.1976). Further, when Captain Spiker went to the kaserne in response to the informant's call, he did not go to apprehend the accused but "with the intent of seeing him . . . for the purpose of . . . search." On discovering the packets of aluminum foil in the vest pocket of accused's suit, he did not ask the accused whether he would discuss the offense for which he was apprehended, but rather whether he was "willing to discuss the offense *under investigation* which . . . was the *suspicion* of possession of drugs." Finally, when Captain Spiker later related the evidence to Special Agent Sells, he did not tell him he had "apprehended" the accused and then searched his clothing. According to Sells, he "was told by Captain Spiker that he orally told Specialist Wallace and Private Trice that he *suspected* them to have . . . [in] their possession controlled substances and [he] *requested* a *consent* search and that *consent* was given." (Emphasis supplied.)

from an enlisted member of his unit who had previously provided reliable information on drug transactions in the unit. The informant reported he had just seen the accused and Private Trice in the accused's room at Coleman Kaserne and that the accused "had speed on his person ... at that time." Captain Spiker went to the billets. There, he encountered his first sergeant. He asked the sergeant to accompany him to the accused's room, which was on the fourth floor. On the stairwell landing of the third floor, they met the accused and Trice. The accused was carrying a suit on a hanger. According to Trice, he and the accused "were on ... [their] way out" to go to Frankfurt, but were "stopped" by the captain and the first sergeant.

Spiker, Trice and the accused went to the accused's room.[3] On entering, Spiker informed the accused and Trice that he had been told "they were currently in possession of drugs." On direct examination, he stated he then asked whether "they would consent to a search of their person, personal clothing and wall locker," and he told them "they did not have to consent." Both accused and Trice said "yes they were willing to do so." Thereupon, Captain Spiker asked Trice to sit down and not "touch anything." When Trice was seated, the captain asked the accused to hand over his clothing piece by piece.

Finding nothing in the clothing worn by the accused, Captain Spiker asked for the suit the accused had been carrying when they met on the stairwell landing. The accused gave it to him. In a pocket of the vest, Captain Spiker found "three small pieces of aluminum foil folded up." On seeing the objects, the accused started to speak, but the captain persuaded him to silence until later. The captain then looked through accused's wall locker but "found nothing else."

Accompanied by Lieutenant Banks and the first sergeant,[4] Trice was sent to his own room. When they had left, Spiker advised the accused of the right to remain silent and to have a lawyer present. Accused said he did not want a lawyer and he was willing to talk. At that, the captain displayed the foil packets and asked, "What is this stuff?" The accused replied that "he did not know." He maintained the packets did not belong to him. He explained that he was "going down the hall" when "a friend" gave them to him "and told him to hold them." He refused to identify the friend.

At the end of their conversation, Captain Spiker and the accused went to Trice's room. Trice was searched and marihuana leaves and seeds were found in his possession. Accused and Trice were then "escorted ... to the Gelnhausen Military Police Station."

Responding to a call from the station, Special Agent Sells appeared there. He spoke to Captain Spiker who informed him that he had "requested a consent search [from the accused] and that consent was given." Sells also interviewed the accused. After first being advised of his right to remain silent and to have a lawyer present, the accused waived both rights and signed a Department of the Army form in which he acknowledged the advice and his understanding and waiver of his rights. In the conversation that followed, the accused referred to the search. In pertinent part, Agent Sells' testimony is as follows:

> [They] went back to Specialist Wallace's room which was 408 at that time. At which time Captain Spiker requested a consent search which Wallace told me that he gave his consent to.

---

3. The first sergeant did not testify at trial. His testimony at the Article 32 investigation indicates that, after the encounter with the accused and Private Trice, he went to find another person in the billets who had apparently also been identified by the informant as having possession of a prohibited substance. The sergeant entered the accused's room when Captain Spik-

er was already examining the accused's clothing. Similarly, a Lieutenant Banks appeared in the room, but his Article 32 testimony shows that he arrived after the first sergeant. He, too, did not testify at trial.

4. *See* n.3, *supra.*

No evidence as to accused's age, general intelligence, and years of military experience was presented to the trial judge before he ruled on the admissibility of the evidence obtained in the search. However, the accused was a Specialist Four, and we can properly assume he wore his insignia of rank when he appeared in the courtroom. Para. 60, Manual for Courts-Martial, United States, 1969 (Revised edition). The trial judge could, therefore, reasonably infer that accused had had some years of military experience. In fact, the accused was 27 years of age and he had almost 8 years of military service. At the outset of the court proceeding, he had responded to inquiries by the trial judge into his understanding of his right to counsel and his election to representation by civilian counsel of his own choice, without the assistance of detailed defense counsel. He had also been questioned by the trial judge as to his understanding of, and desire to waive, trial before a court-martial composed of court members in favor of a bench trial. From the accused's appearance, the form and content of his responses to the judge's questions, and his general demeanor during the inquiries, the trial judge could reasonably conclude that the accused was a mature and experienced person, who could comprehend, and be willing to assert, "his legal rights" when informed of them. *United States v. Middleton, supra* at 133.

To this point, we have not mentioned the particulars of Captain Spiker's meeting with the accused and Trice on the stairwell landing. We consider them now. We previously have remarked that the accused and Trice were "stopped" by the captain and the first sergeant. Trice testified "they *asked us* to come back upstairs." (Emphasis supplied.) However, Captain Spiker stated that he "*directed* both Specialist Wallace and . . . [Trice] to follow . . . [him] up" to the accused's room. (Emphasis supplied.)

■ In footnote 3 we set out circumstances that might justify a conclusion that Captain Spiker did not impose such restraint on accused's freedom of movement as to amount to a formal apprehension. But if accused was not formally apprehended, he was unquestionably subjected to some degree of official restraint. Captain Spiker's own characterization of how he effected accused's return to his room leaves no doubt that he and the accused believed the accused was not free to go anywhere else. In short, the accused was under official control, even if not technically apprehended. *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). Control of that kind requires that we examine with "[s]pecial caution" the evidence purporting to prove the search was consensual. *United States v. Decker, supra* at 401, 37 C.M.R. at 21. As observed in *United States v. Middleton, supra* at 132–33, "the ultimate question of the existence of consent involves application of a legal standard and so is subject to appellate review."

### III. THE TEST FOR DETERMINATION OF CONSENT AND ITS APPLICATION TO THE FACTS.

■ Consent to a search must be voluntary. Whether the person who gives his consent acts in the exercise of his own free will "is a question of fact to be determined from all the circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854 (1973). *See United States v. Middleton, supra; United States v. Decker, supra.* Judicial "precedents [, therefore,] are, at best, of doubtful value." *United States v. Berry,* 6 U.S.C. M.A. 609, 613, 20 C.M.R. 325, 329 (1956). Still two cases provide special guidance to decision because of their identification of the probable effect of particular circumstances—*United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), and *United States v. Middleton, supra.*

*Watson* is especially notable for its declaration that "the fact of custody alone has never been enough in itself to demonstrate a coerced . . . consent to search." *Id.* at 424, 96 S.Ct. 828. All the other relevant factors in this case fall on the side of consent.

*Middleton* identified as "militating in favor of the trial judge's finding of consent" (10 M.J. at 133) the following:

1. "[A]dvice to . . . [the individual] that he need not consent unless he wished to do so"; the accused here was so advised.

2. That the individual was an adult, with creditable experience in the military; the accused in this case was 27 years of age, and he had nearly 8 years of creditable military service.

3. That the individual has the capability and "willingness" to exercise a free choice in respect to a known legal right;[5] such capability and willingness on the part of the accused are apparent from the inquiries by the trial judge into the accused's understanding of the right to trial by a court-martial composed of court members and in regard to his right to individual counsel.

*Watson* weighed in favor of the voluntariness of consent the following circumstances:

1. That the request for consent was made in a place that carried no atmosphere of compulsion, such as a police station; here, Captain Spiker requested accused's consent to search in the accused's own room and in the presence of Trice, accused's friend.

2. That "no overt act or threat of force against . . . [the defendant was] proved or claimed." (423 U.S. at 424, 96 S.Ct. at 828). In this case, nothing in the record, including Trice's testimony, suggests that accused was subjected to coercive words or actions. Moreover, the accused faced only his unit commander, a situation markedly different from that in *Middleton*, where the accused "was surrounded by" an investigator from the Military Police, a "dog handler and his dog, . . . possibly either the first sergeant or another noncommissioned officer" (10 M.J. at 133), as well as his commanding officer.

3. That no evidence of "subtle forms of coercion" (423 U.S. at 424, 96 S.Ct. at 828) appeared in the record and no promises were made to the defendant. The record here is similarly devoid of evidence of any promise to the accused to induce his consent. Unless Captain Spiker's position as a commissioned officer and his status as accused's immediate commander inherently constitute a "subtle . . . coercion," the record contains no hint of such influence on the accused. We unqualifiedly reject the attribution of coercive influence to Captain Spiker's rank and office.

In *Middleton*, the Court considered a situation in which the accused's commander was present when the accused was asked to consent to a search of his locker by a military police investigator. From what was said and done by the investigator, the Court perceived, as an "arguable" inference, that the accused could have concluded the commander had already authorized the search and, therefore, he "simply submitted to the claim of authority made by those surrounding him, rather than freely and voluntarily consenting to their request to search." *Id.* at 134. As we emphasized earlier, only Captain Spiker and the accused's friend, Trice, were present when the request for consent to search was presented to the accused. True, Captain Spiker had asserted his authority to stop the accused from leaving the kaserne and to "direct" him to return to his room. However, the captain's first words to the accused in regard to a search informed him that he had the right to "refuse consent." Consequently, the *Middleton* situation is wholly inapposite. We confidently conclude, therefore, that Captain Spiker's rank and office did not exercise a coercive effect on accused's freedom to choose between giving consent and denying it.

Finally, there is Agent Sells' testimony of his interview of the accused after the

---

5. In *United States v. Middleton, supra* at 133, the Court indicated that in determining whether the accused had consented to a search, the fact that the accused had a limited formal education and a low "GT score" could be counted against a finding of consent. No evidence of either of these circumstances was presented to the trial judge here. If those factors can be considered, although not presented to the trial judge for his consideration of the issue, both would support the finding that the accused's consent was voluntary. The allied papers show the accused's "Aptitude Area GT Score" is 102 and he is a high school graduate.

search. On that occasion, the accused was again advised of his right to remain silent and to have counsel present at the interview; the accused waived both rights. In discussing the search, he told Agent Sells that Captain Spiker had requested his consent to a search and he had given "his consent."

Considering the totality of the circumstances bearing upon the issue, we conclude, as we noted at the beginning of our opinion, that the trial judge's determination that the search was consensual is fully supported by the evidence. Accordingly, the decision of the United States Army Court of Military Review is affirmed.

Chief Judge EVERETT and Judge FLETCHER concur.