UNITED STATES

v.

Mario E. BARRIENTOS, 355 65 5469, Private (E–1), U.S. Marine Corps.

NMCM 83 5223.

U.S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 31 Aug. 1983.

Decided 30 March 1984.

**1026**

LTCOL M.W. Lucas, USMC, Appellate Defense Counsel.

LT John B. Consevage, JAGC, USNR, Appellate Defense Counsel.

LCDR John B. Holt, JAGC, USN, Appellate Government Counsel.

Before SANDERS, Senior Judge, and MAY and CASSEL, Judges.

SANDERS, Senior Judge:

Appellant was convicted by general court-martial of being disrespectful to and willfully disobeying his superior officer in violation of Articles 89, 10 U.S.C. § 889, 10 U.S.C. § 890, and 90, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 889, 10 U.S.C. § 890, and of willfully and maliciously setting fire to his battalion's conference room in violation of Article 126, UCMJ, 10 U.S.C. § 926. His sentence to a dishonorable discharge, confinement at hard labor for two years and total forfeitures was approved by the convening authority.

Two errors have been assigned for our consideration:

I

THE MILITARY JUDGE ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS OBTAINED AS A RESULT OF AN ALLEGED CONSENSUAL SEARCH OF APPELLANT'S BARRACKS ROOM. APPELLANT ARGUES THAT HIS CONSENT WAS NOT VOLUNTARY AND WAS THEREFORE INVALID. HE FURTHER ARGUES THAT ALL EVIDENCE AND STATEMENTS OBTAINED FROM THE ILLEGAL SEARCH SHOULD BE SUPPRESSED. MILITARY RULES OF EVIDENCE, RULE 314(e); *UNITED STATES V. MIDDLETON,* 10 M.J. 123 (C.M.A.1981).

II

THE MILITARY JUDGE ERRED IN DENYING THE DEFENSE MOTION TO SUPPRESS EVIDENCE AND STATEMENTS OBTAINED AS A RESULT OF AN ALLEGED CONSENSUAL SEARCH OF APPELLANT'S LIVING QUARTERS. SPECIFICALLY, APPELLANT ARGUES THAT AN INITIAL ILLEGAL SEARCH SO TAINTED THE CONSENSUAL SEARCH, THAT THE EVIDENCE MUST BE SUPPRESSED AS FRUITS OF A POISONOUS TREE, NOTWITHSTANDING THE VALIDITY OF THE LATER ALLEGED CONSENT.

When Special Agent D. of the Naval Investigative Service and Gunnery Sergeant M. of the base Criminal Investigation Division investigated the scene of the fire they found fire accelerant on the floor, matches scattered about and a distinctive footprint, apparently made by a sneaker, in a chair under the window whose curtains had been burned. Finding similar footprints outside,

they followed them to three barracks. In each barracks they conducted permissive searches of the rooms where possible (not many of the occupants were in because this was early on a Saturday morning following a pay day) looking for the sneakers and clothes which smelled of smoke. As they came to appellant's room in the third barracks they learned that appellant was restricted and that on the night before he had been intoxicated and destructive. After knocking on appellant's door and getting no response, Special Agent D. left the building to check appellant's restriction papers. While he was gone GySgt M., had himself let into the room and found shoes with treads which seemed to match the prints in the chair. He then left the room, closed the door which locked itself and reported his discovery to Special Agent D. when the latter returned.

In a very few moments appellant appeared from a nearby room. Special Agent D. introduced himself and told appellant that he was conducting an arson investigation and that he would like to search appellant's room for sneakers and examine the clothing appellant had worn the previous night. Special Agent D. did not advise appellant that he could remain silent, Article 31(b), UCMJ, 10 U.S.C. § 831(b), but did inform appellant that he did not have a warrant and that appellant did not have to consent to the search. Appellant replied, "No problem" and let the party consisting of Special Agent D., GySgt M. Lt H., the OD, and Cpl W., the Duty NCO, into the room.

Special Agent D. immediately located the sneakers on a top bunk bed in such a position that the treads could be seen without moving the shoes. They were seized. Special Agent D. then asked appellant if he could continue the search by looking into appellant's locker, drawers and laundry bag and appellant denied consent, whereupon he was apprehended and handcuffed.

The search continued after appellant's acting commanding officer had been briefed and had given his authorization. Nothing of significance was found in the locker but a matchbook which could have been the source of the matches found at the scene of the fire was found in appellant's trousers hanging on a bedpost.

Appellant was taken to the Provost Marshall's Office where, after lunch and again being advised of his Article 31(b), UCMJ, rights, he confessed to setting the fire.

■ In our opinion the totality of the circumstances set forth above establishes clearly and convincingly that appellant freely and voluntarily gave his consent to the search of his room. *United States v. Wallace,* 11 M.J. 445 (C.M.A.1981); *United States v. Middleton,* 10 M.J. 123 (C.M.A. 1981). The fact that he was told that he did not have to give his consent, coupled with his affirmative reply of "No problem" and his later withdrawal of consent, are evidence that appellant was aware of his options and intelligently exercised them. *United States v. Noreen,* 23 U.S.C.M.A. 212, 49 C.M.R. 1 (1974).

■ Nor is there any evidence that appellant was coerced into giving his consent by the earlier unjustified search. *United States v. Mota Aros,* 8 M.J. 121 (C.M.A. 1979). He was neither aware that the search had taken place nor that the shoes had been found.

Finally, we note that appellant would have been asked to consent to the search of his room in the normal course of Special Agent D.'s thorough police work even had the shoes not previously been discovered. The consensual search, therefore, was not solely the result of the earlier improper police action. *United States v. Kilby,* 3 M.J. 938 (N.C.M.R.1977).

■ Consequently, we find that appellant's voluntary consent to the second search wiped the slate clean of the taint created by GySgt M.'s precipitate entry. It follows that the shoes seized were admissible in evidence, that their seizure gave the commanding officer probable cause to authorize the search that led to the discovery of the matchbook (without resort to the possible applicability of the "plain view" doctrine) which was likewise admissible,

and that appellant's statement, given after appropriate warnings, was admissible.

Appellant's assignments of error are without merit.

Accordingly, the findings of guilty and the sentence, as approved on review below, are affirmed.

We have considered defense counsel's response to the staff judge advocate's review in reaching this decision. Appellant, however, must be given administrative credit for the pretrial confinement served from 16 July until 31 August 1983. *United States v. Allen,* 17 M.J. 126 (C.M.A.1984).

Judge CASSEL concurs.

MAY, Judge (dissenting):

I dissent. I disagree with my brothers in this case because I do not find, from an examination of the trial record, sufficient factual evidence to support by clear and convincing evidence, appellant's asserted consent to the search of his barracks room. MIL.R.EVID. 314(e).

The majority opinion does not address the significance of the following testimony extracted from the trial record:

"(1) Extracts from testimony of NIS Agent D:

"Q. After you identify yourself, what steps do you take next?

"A. At that point I tell BARRIENTOS why I am there. I tell him that I am investigating an arson investigation. I ask him, will he give me permission to conduct a search of his room. I am specifically looking for the shoes that he would have been wearing, or the clothing that he would have been wearing last night.

"Q. Did you warn him of his rights?

"A. No, sir.

"Q. Did you tell him that you had a search warrant?

"A. No, sir.

"Q. After you had described or introduced yourself, and you had indicated that you—what you wanted to do, did he respond to your inquiry?

"A. Yes, sir, he did.

"Q. What happened, or what did he say?

"A. Sir, if I might add, I told him that I did not have a search warrant and he said no problem. He walked to his door. Whether he had to punch the combination or just push it open, he went in.

"Q. Who else was present at this time? Who else was in the hallway, and who else entered the room?

"A. Present at that time, sir, was Gunnery Sergeant M——— and Lieutenant H———, the OD, Corporal W———, the Duty NCO. I believe SMITH has now shown up, the roommate.

"(2) Extracts from testimony of Gunnery Sergeant M, CID agent:

"Q. Was anybody in the room, BARRIENTOS room, at that time, to your knowledge?

"A. I believe his roommate probably was.

"Q. Do you know if the door was open or shut?

"A. I believe it was open.

"Q. What happens at this point when BARRIENTOS arrives in the hallway?

"A. [Agent] D——— (emphasis added) asked BARRIENTOS for his consent to look at his property, and BARRIENTOS consented to the search.

"Q. How did he do that? What manner of actions, speech, or words?

"A. I don't recall his exact words. I just remember him giving his consent.

"Q. How was he informed, or what was he told by Agent D———? Did you hear what Agent D——— told him?

"A. I do not recall the exact words that he told him.

"(3) Extracts from testimony of Corporal W———, Duty NCO on duty 16 July 1983:

"Q. Then what took place?

"A. I went down to BARRIENTOS room. Mr. D——— and Gunny M——— were both sitting on the

floor in the hallway, waiting for BARRIENTOS arrival, should he decide to come back to his room. I knocked on a couple of doors down at that end of the building, to see if anybody had seen BARRIENTOS. Upon knocking on a few doors, with no answer, I knocked on Lance Corporal F_____'s door. He asked who it was and I told him the Duty NCO. He opened the door and I asked him if he had seen BARRIENTOS. Upon me looking into the room I seen BARRIENTOS inside the room.

"Q. Then what happened? What did you do then?

"A. I then told BARRIENTOS could he come out of the room, there is a CID agent and NIS agent that would like to talk to him.

"Q. Did he exit the room?

"A. Yes, he did.

"Q. Then what happened?

"A. He came out into the hallway, and they explained to him, to BARRIENTOS, that they were looking—they were looking for something or other pertaining to an incident that happened in the Battalion conference room.

"Q. Do you remember exactly what they said they were looking for?

"A. Not verbatim. I could not quote it. It was such a long time ago, sir. I really don't remember exactly what was said. But it was to the effect that they—they mentioned to him that they looked at rooms of other barracks as well. That it was not just a random search on that room.

"Q. Were they asking his permission to enter the room?

"A. Yeah, they asked him would he mind if they looked around inside of his room, and—

"Q. Then what happened?

"A. They mentioned—Private BARRIENTOS was interested in knowing why they wanted to look into his room. They told him at that time, Gunny M_____ (emphasis added) told him that he did not have to let them into the room. He did not have to let them into the room if he did not want to. Private BARRIENTOS told the agents that he had nothing to hide. So, he opened the door.

"(4) Extracts from testimony of Lance Corporal F:

"Q. Did the Duty NCO come to your room?

"A. Yes, he did.

"Q. Do you remember what his name was?

"A. Corporal W_____.

"Q. Did he knock on your door?

"A. Yes, he did.

"Q. Do you remember what he had to say, or anything?

"A. He asked me if I had seen Private BARRIENTOS.

"Q. What happened then?

"A. I said, well, he is right over there.

"Q. Okay, then what happened?

"A. Then Corporal W_____ said, BARRIENTOS, *could you please come with me and open up your room.* (emphasis added)

"Q. And he stepped out in the hall. Did you go out in the hall?

"A. No. I did not. I let the door close and I sat back down.

"(5) Extracts from testimony of Lance Corporal Smith, appellant's roommate:

"Q. Now, in that end of the barracks, when you got to the end, where was your room located, did you see anybody else in that barracks area?

"A. Yes, sir. When I got in the hallway there was the Duty NCO, Private BARRIENTOS, and two NIS agents.

"Q. Now, in the hallway you say you saw Private BARRIENTOS. Do you remember exactly in the hallway where he was?

"A. He was down there across from our room in the hallway.

"Q. So, he was sort of across the hall from the door to your room?

"A. Yes, sir.

"Q. You were Private BARRIENTOS roommate at that time?

"A. Yes, sir.

" . . .

"Q. He was on the opposite side of the hallway from the door to your room?

"A. Yes, sir.

"Q. There was the Duty NCO and some agents there, right?

"A. Yes, sir.

"Q. And you are walking up with the officer of the Day?

"A. Yes, sir.

"Q. Then what happened?

"A. They asked me where was my room.

"Q. Did they tell you who they were?

"A. Yes, sir.

"Q. How did they identify themselves? Did they just tell you, or what?

"A. They showed me their badges.

"Q. And did they indicate what they wanted you to do?

"A. They just asked me to open my room.

"Q. Did you feel compelled or forced to open your room?

"A. No, sir.

"Q. Did you open that room?

"A. Yes, sir.

"Q. Who went into the room?

"A. Me, the Duty NCO, Officer of the Day, and both NIS agents.

"Q. Were you asked any questions in that room?

"A. Yes, sir, I was asked which side of the room was mine, and which side was his.

"Q. Did you identify that?

"A. Yes, sir.

"Q. Would you state what you recall as far as questions that were asked of Private BARRIENTOS by the agents?

"A. Well, I don't really know what they asked him, because they asked me to step out of the room."

I find from my analysis of the record, tangible evidence that instead of voluntarily consenting to the search of his room, appellant acquiesced to the apparent authority presented in turn, by the duty NCO, the officer of the day, and the investigative agents. *United States v. Chase*, 1 M.J. 275 (C.M.A.1976); *United States v. Westmore*, 14 U.S.C.M.A. 474, 34 C.M.R. 254 (1964). I do not find sufficient attenuation of Corporal W's "order" to appellant to come out of the nearby room and open up his room, the conflicting assertions of informed consent and selective memory of the agents to the contrary. I am also not convinced from the conflicting testimony presented, that appellant was not initially confronted with an already opened room, occasioned by his roommate's prior consent. If that was the case, any asserted "plain view" seizure would be barred given the obvious subterfuge employed. *See Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1970); *United States v. Mossbauer*, 20 U.S.C.M.A. 584, 44 C.M.R. 14 (C.M.A.1971).

I would therefore consider inadmissible both the physical evidence seized and appellant's resulting statements. *See United States v. Waller*, 3 M.J. 32 (C.M.A.1977).

Finally, I feel some comment is in order concerning the clearly illegal and unprofessional actions of the government agents in this case. The demands of the Fourth Amendment require no restating by me, even when an otherwise error-free conviction has been achieved. As long as the constitutional protection against unreasonable searches and seizures exists, the drastic sanction barring evidence also exists. In this case, the government can take little pride in respect to its handling of this search and seizure. Two apparently experienced investigative agents, a command authority in the person of the officer of the day, and the duty noncommissioned officer, all participated in the exploitation of the individual unlawful activity of Gunnery Sergeant M. The opportunity clearly exist-

ed to properly and explicitly cleanse the search process of the obvious taint of Gunnery Sergeant M's unlawful entry of appellant's room. Certainly the opportunity existed to bar all entry into appellant's room until, under appropriate conditions, free of coercive atmosphere, appellant's consent could have been obtained after he had been specifically advised of his right to refuse the search request.

If appellant had refused to assent to a search of his room and personal belongings, appropriate procedures were available to request a command authorized search. MIL.R.EVID. 315. Instead, all officials on the scene chose to follow Gunnery Sergeant M's advice:

Extract from testimony of First Lieutenant H, describing Gunnery Sergeant M's actions following earlier unlawful entry into appellant's room:

Q. After you went out the door then what happened?

A. The agent goes, "Let's see if we can find BARRIENTOS. We will try and play cool." Basically what he said was just to try and play it cool and not get him suspicious.

I would reverse the findings in this case and authorize a rehearing.